569 So.2d 681 (1990)
Becky Thomas Smith PREMEAUX
v.
James Thomas SMITH, Jr.
No. 89-CA-0377.
Supreme Court of Mississippi.
October 17, 1990.
*682 Fielding L. Wright, Jr., Pascagoula, for appellant.
Thomas J. Lowe, Jr., E. Michael Marks, Jackson, for appellee.
Before DAN M. LEE, P.J., and PRATHER and ANDERSON, JJ.
PRATHER, Justice, for the Court:
This appeal challenges the sufficiency of proof for imposition of a jail sentence for a criminal contempt finding in the Chancery Court of Jackson County. Becky Thomas Smith Premeaux filed a motion for citation of contempt against her ex-husband, James Thomas Smith, Jr. for non-payment of child support for some fifteen (15) years and totaling approximately $14,000.00 arrearage. The Chancery Court dismissed her motion, finding that the mother was guilty of criminal contempt for "secreting the subject child" from the father. From a sentence of eighteen (18) days in jail and direction to pay $500.00 to her ex-husband's attorney for defense to her motion, Premeaux appeals assigning the insufficiency *683 the proof of criminal contempt beyond a reasonable doubt.

I.
Becky Thomas and James Thomas Smith, Jr. were married in May, 1969. Their marriage was a brief one, as Becky separated from James taking their new born son, James Thomas Smith, III (Jim) and moving to Jackson County, Mississippi, in June of 1971. The couple was granted a divorce in the Chancery Court of Jackson County in December of 1971. The divorce decree gave paramount custody of Jim to Becky and gave reasonable visitation rights to James. James was also ordered to pay $65 a month in child support.
Becky testified that after leaving James in Jackson she lived with her mother for a short period and then moved into her own apartment in Pascagoula, Mississippi. Becky lived there for approximately six months to a year. James knew of her address in Pascagoula.
Becky then moved to Gautier with the father of her second child. James also knew of this address as he actually came to the trailer in which she was living.
In June of 1972 Becky and the children moved into a house in Ocean Springs, where she has lived ever since. James was not given this address as Becky had not heard from him for quite some time. Becky testified that she had not in any way concealed the whereabouts of herself and Jim from James.
James joined the Marine Corps after the divorce and arranged for an allotment of $105.00 per month to be paid to Becky for Jim. The allotment was discontinued after two years at the time of his severance from the armed services. Jim continued to pay $65 a month for approximately another nine months but made no further payments.
James' sole attempt to find Becky after his discharge from the Marine Corps in 1974 was by contacting his ex-mother-in-law. She refused to give James any information of Becky's whereabouts and "threatened" his life and told him to leave Becky alone. James stopped his efforts to locate Becky and Jim.
Jim testified that his mother and other family members talked to him about James and asked if he wanted to see him or call him. Jim has never recognized anyone as his father except James. Jim also testified that he often thought about calling his father and that although he used the name Premeaux in school he always knew that he was a Smith.
In April of 1988, Becky Thomas Smith Premeaux filed a motion to find James Thomas Smith, Jr. in contempt of court for failure to pay child support and to recover arrearages totalling $14,755. The court action was prompted to secure for her son financial assistance for college expenses. James Thomas Smith, Jr. filed his response and affirmative defenses requesting that Becky Thomas Smith Premeaux be found in contumacious contempt of court.
The trial court denied the arrearages and found that Becky Thomas Smith Premeaux set about to deliberately, premeditatedly and effectively cut off contact between the father and the son and adjudged Becky Thomas Smith Premeaux to be in obstinate and contumacious contempt of court. As a result she was sentenced to 18 days in the county jail and ordered to pay her ex-husband's attorney's fees for defense to this action.
The only assigned error on this appeal is whether Becky Thomas Smith Premeaux was properly found guilty of criminal contempt beyond a reasonable doubt. Although this Court may recognize the denial of the arrearages as plain error, it does not address this issue in this appeal.

II.
The factual findings of the chancery court in a civil contempt case are affirmed unless manifest error is present and apparent. However, this appeal addresses a finding of criminal contempt which is punitive in nature, and this Court is not bound by the manifest error rule when reviewing an appeal of a conviction of criminal contempt. Review proceeds ab initio to determine whether on the record the contemnor *684 is guilty of contempt beyond a reasonable doubt. Mabry v. Howington, 569 So.2d 1165, 1167 (Miss. 1990) (reversing and discharging defendant of criminal contempt); Cook v. State, 483 So.2d 371, 374 (Miss. 1986); Prestwood v. Hambrick, 308 So.2d 82, 84 (Miss. 1975).
A citation for criminal contempt is to vindicate the dignity and authority of the court. A citation is proper only when the contemnor has wilfully, deliberately and contumaciously ignored the court. Cooper v. Keyes, 510 So.2d 518, 519 (Miss. 1987). Prerequisite is a decree which defines with reasonable specificity what the alleged contemnor must do or refrain from doing. Hinds County Board of Supervisors v. Common Cause, 551 So.2d 107, 119-120 (Miss. 1989); Wing v. Wing, 549 So.2d 944, 947 (Miss. 1989). The burden of proving the criminal contempt is on the party asserting it. Cook v. State, 483 So.2d 371, 375 (Miss. 1986). For a conviction of criminal contempt the guilt of the contemnor must be established beyond a reasonable doubt. Miss. Code Ann. § 11-51-11(4) (Supp. 1990); Varvaris v. State, 512 So.2d 886, 888 (Miss. 1987) (each element of criminal contempt must be proved beyond a reasonable doubt); Mabry v. Howington, supra, at ___ (defendant must be afforded minimum due process rights) (citing D. Dobbs, LAW OF REMEDIES 97 (1973)); See also Hinds County Board of Supervisors v. Common Cause, 551 So.2d 107, 120-121 (Miss. 1989); Common Cause of Mississippi v. Smith, 548 So.2d 412, 414-418 (Miss. 1989); Culpepper v. State, 516 So.2d 485 (Miss. 1987); Prestwood, supra.
Due process includes notice to the alleged contemnor that she was being considered for criminal contempt. Cook v. State, 483 So.2d 371, 375 (Miss. 1986). Here the father James Thomas, Jr. pled the mother's alleged "obstinate, deliberate, and contumacious contempt of this Court for secreting the subject child away from the [father] which denied him visitation rights for eighteen (18) years" only as a defense and affirmative matter to the contempt charge against him. He did not file a cross-bill of contempt against Premeaux, but only prayed for the dismissal of contempt charged against himself. Vol. I, P. 9.
The record does not establish that Becky wilfully, deliberately and contumaciously concealed her whereabouts from James. Becky moved three times after the divorce, but gave James the address the first two times. The third time she did not give him the address because she felt he did not care. Each of the three moves was in Jackson County and the third move has been her permanent residence for the past 16 years.
Becky did not take the initiative in letting James know where she and Jim were. However, there is no evidence in the record to show that she actively tried to stop James from contacting Jim. The only evidence in the record to support such belief is that Jim used his step-father's name while in school and that Becky's mother would not give James any information. The action of her mother in refusing to give information as to Jim's whereabouts should not be attributed to Becky. It is not unusual that a step-child uses the step-father's name in school records. Nor is there evidence to support the chancellor's finding that Becky solicited the aid of her mother to help conceal the child from his father. These facts do not establish beyond a reasonable doubt that Becky wilfully and deliberately tried to keep James from Jim.
This Court holds that there is insufficient evidence to show, beyond a reasonable doubt, that Becky is guilty of criminal contempt. The judgment of the trial court insofar as a finding of criminal contempt is manifest error, and this Court vacates the jail sentence and award of attorney's fees.

III.
It is noted that there is no assignment of error regarding the overruling of the mother's request for a judgment for arrearages in child support.
The law regarding child support entitlements is well settled in this state. *685 Once child support payments are past due they become vested and cannot be modified. Thurman v. Thurman, 559 So.2d 1014, 1016 (Miss. 1990); Hull v. State Department of Public Welfare, 515 So.2d 1205 (Miss. 1987); Brand v. Brand, 482 So.2d 236 (Miss. 1986); Hailey v. Holden, 457 So.2d 947 (Miss. 1984); Cunliffe v. Swartzfager, 437 So.2d 43 (Miss. 1983); see also Guthrie v. Guthrie, 537 So.2d 886 (Miss. 1989), (father was delinquent in child support payments for 18 years).
Therefore, this opinion is without prejudice to the child's right to pursue his rights directly, Atwood v. Hicks By Hicks, 538 So.2d 404 (Miss. 1989). See Wilson v. Wilson, 464 So.2d 496, 498 (Miss. 1985). Trunzler v. Trunzler, 431 So.2d 1115, 1116 (Miss. 1983). The chancellor noted in his judgment that the child should deal directly with his father concerning financial help for college.
THE CHANCELLOR'S FINDING OF CRIMINAL CONTEMPT IS REVERSED, APPELLANT DISCHARGED, AND SENTENCE OF EIGHTEEN (18) DAYS VACATED. THE AWARD OF ATTORNEY'S FEES OF $500.00 IS REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., and ROBERTSON, ANDERSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
SULLIVAN, J., and HAWKINS, P.J., dissent by separate written opinion.
SULLIVAN, Justice, dissenting:
On December 8, 1971, James Thomas Smith, Jr., and Becky Thomas Smith (Premeaux) were divorced. Becky was given custody of their infant son. James was given visitation rights of one weekend each month and other reasonable visitation privileges. James was also ordered to pay $65.00 per month for child support.
The current action was initiated by Becky on April 11, 1988. At that time, she filed a Motion to Find Defendant in Contempt of Court and asked for child support arrearages of $12,220.00 for the period beginning January, 1972 and ending March, 1988. James, in turn, asked that Becky be held in contempt for secreting their son for eighteen years thus denying James of visitation rights. At trial, James and Becky gave conflicting testimony of the events which occurred before and after their divorce.
James and Becky resided in Hinds County. When Becky left James in June of 1971, she went to stay with her mother in Jackson County. She stayed with her mother for about a month before moving to an apartment. In August, Becky filed for divorce in Jackson County. The divorce was granted in Jackson County on December 8, 1971. James did not contest the divorce.
According to James, he had tried to locate Becky and his son before joining the Marine Corps on December 27, 1971. He had called Becky's mother who told James that her daughter was not there. Later, she told James that Becky was down there (Jackson County), but she would not tell him where to locate Becky. Once, James even went to Jackson County to a nightclub owned by Becky's mother but failed to see anyone. James said that he tried to locate Becky many times by calling the Jackson County operator to see if a number was listed for Becky but these attempts were unsuccessful.
Becky claimed that James did know where she lived. When she first left James, she lived with her mother. After approximately a month, she moved into her own apartment. She said that not only had she notified James where she had moved, but he visited her a couple of times. She lived in the apartment approximately six months and then moved to Gautier where she lived in a trailer next to her mother's house with a man by the name of Irving Cobb. Cobb was the father of Becky's second child with whom she was four months pregnant when her divorce was granted in December. Becky said James knew about this move also.
The son of Becky and Cobb was born on May 3, 1972. Becky claimed that James *686 visited her the day before he was born (or at least a couple of days before she went into labor). However, James was in the service and was home for only ten days in March after he finished boot camp. James said he did not know Becky's address or even learn what it was during that visit.
When James joined the service, he requested that $105.00 be mailed to his ex-wife each month. (James spent most of his time in the service in Spain.) The allotment was mailed to a post office box which James said he received from Becky's mother. Becky said that the post office box belonged to her and that James learned about it directly from her.
Becky and Cobb lived in the trailer until June of 1972. At that point, they built a house in Ocean Springs and lived there. Becky said she had stopped receiving the monthly allotment before she had moved to Ocean Springs although earlier she had testified that she received the allotment for a year. James said the allotment was sent for two of the three years he was in the service and that he continued to send $65.00 per month after the allotment was discontinued and while he was still in the service.
James left the service in July of 1974. At that time, he again called Becky's mother. She told James that Becky did not want him back in her life because there was another man in her life. Additionally, Becky's mother threatened his life. After that, James made no more effort to contact his ex-wife and child.
Becky and Cobb separated in 1975, and she remarried in 1976. She and her husband continued to live in the house in Ocean Springs. The son of James and Becky was known by his stepfather's name of Premeaux at school although he was not adopted by Premeaux. Becky and Premeaux were married approximately six years and then they divorced.
Becky said she never wrote to James to tell him where she was or to ask for child support because she felt that his lack of effort to contact his son showed that James was not concerned about his son. She also said she knew nothing about his attempts to contact her through her mother.
After hearing the testimony, the chancellor expressed concern over Becky's conduct. He found that
Mrs. Premeaux set about deliberately, premeditatedly to effectively cut off any contact between this father and his son... . That intent is manifested in several things; concealing her whereabouts insofar as her mother was concerned, through the telephone company, and by changing the child's name so that even an inquiry of the school system would not disclose to the father where the child was; because he wasn't registered in his own name.
The record contains the testimony of three people  Becky, James, and their son, James, Jr. Becky's version of the events from 1971 to 1974 differed greatly from that of James. The outcome of the case largely depended upon which version the chancellor accepted as being correct. The chancellor chose James' version. The majority clearly chooses Becky's version.
As stated in the majority opinion, this Court proceeds ab initio in a judgment for contempt. However, that does not preclude the fact that
[W]e sit as an appellate court, and as such are ill equipped to find facts... . [E]ven if we wanted to be fact finders, our capacity for such is limited in that we have only a cold, printed record to review. The trial judge who hears the witnesses live, observes their demeanor and in general smells the smoke of the battle is by his very position far better equipped to make findings of fact which will have the reliability that we need and desire.
Gavin v. State, 473 So.2d 952, 955 (Miss. 1985).
Where the testimony is conflicting, the chancellor is the best judge of the correct version. "Being able to observe the demeanor of the witnesses, to scrutinize their reactions and responses to the questions propounded by counsel, puts the fact trier in a uniquely superior position to glean the truth from testimony." Johnson v. Brewer, *687 427 So.2d 118, 126 (Miss. 1983). See also Pellegrin v. Pellegrin, 478 So.2d 306, 308 (Miss. 1985).
Here, even though we did not see Becky testify, her version of the events is questionable. Her testimony was a series of conflicting statements and discrepancies. For example, Becky gave inconsistent times throughout her testimony as to when the allotment sent to her was discontinued. At one point, she said she received it for a year. At another, she said she had stopped receiving it before she moved to her new house in June of 1972, which would be approximately six months after the divorce.
Another discrepancy was her testimony that James had visited her right before the birth of her second son in May of 1972. James was in the service at the time and had only been home for ten days in March following boot camp. Furthermore, James testified that he did not know where Becky was living when he was home in March.
Further conflicts in Becky's testimony concerned the various time periods when she moved to the apartment, the trailer, and finally her own house. Additionally, Becky testified that James, Jr., took the name of Premeaux the last four or five years of his schooling. James, Jr., testified, however, that he had used the name since first grade.
James' testimony is much more believable. According to James, Becky made no attempt to notify James as to where she and the child were. In addition, her mother blocked all attempts by James to discover the whereabouts of Becky and his son by telling him that Becky wanted nothing more to do with him. She also threatened his life if he persisted in trying to contact Becky. James, at that point, gave up in his search.
The chancellor not only heard the conflicting testimony, he was able to observe the demeanor of the two parties involved. From that, he concluded that Becky was guilty of criminal contempt for wilfully, deliberately and contumaciously denying James the right to visit his son. A premise of our law in this area is "that children of divorced parents should be encouraged to have a close, affectionate and, under the circumstances, as normal as possible a parent-child relationship." Cox v. Moulds, 490 So.2d 866, 870 (Miss. 1986). Becky's conduct has denied James and his son the chance for such a relationship.
HAWKINS, P.J., joins this dissent.