## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CP-00415-SCT

*IN RE: SUSAN C. SMITH*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/2005 |
| TRIAL JUDGE: | HON. EDWARD C. PRISOCK |
| COURT FROM WHICH APPEALED: | CARROLL COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | PRO SE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JOHN R. HENRY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 04/20/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Today's case involves a pro se appeal from the incarceration of an attorney for direct criminal contempt. The attorney was representing a mother and her daughter in the Chancery Court for the First Judicial District of Carroll County, in Carrollton, in a divorce and a paternity suit, respectively, when the attorney was held in direct criminal contempt by the chancellor for comments she made in open court. The events that led up to the comments are more complex, but the essential fact to this appeal is that the attorney openly insulted the chancery court during a proceeding in which she appeared in her professional capacity. She now appeals the order of the chancery court finding her in contempt. Finding no error, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.    There is but one principal fact to this appeal: an attorney, Susan C. Smith, in open court, on February 16, 2005, made disparaging remarks to the court by saying, inter alia, "I believe that the actions of this Court have been *so* reprehensible as to disgust any court," and afterward, she refused to genuinely apologize, despite being given multiple opportunities by the court to do so. (Emphasis in original). Because of this comment by the attorney, as well as her other actions that day, the chancellor found Smith in direct criminal contempt and incarcerated her for five days. A more detailed factual background is needed to explain exactly what actions of the chancery court Smith found to be reprehensible and disgusting.

¶3.    When these events transpired, Smith, a Greenville attorney, had been representing a defendant in a divorce, and the defendant's son in a paternity action. Smith was present in chancery court on February 16, 2005, for a contempt hearing concerning her client. This hearing was actually the second of two hearings in the cases in which Smith was one of the attorneys. The first hearing, a temporary hearing on matters related to child custody, had taken place on February 4, 2005, and neither Smith nor her clients were present. The husband of Smith's client in the divorce action had filed a complaint for divorce a few months before the first hearing. At the time the divorce action was commenced, process was issued by the clerk for service upon Smith's client, who was directed to appear in court on January 25, 2005, for a hearing on the issue of temporary child custody. Smith's client was served with the summons on January 12, 2005. Smith made an appearance in the case

2

representing the defendant. Both attorneys and the chancellor, through a telephone conference, later agreed to reschedule the hearing for February 4, 2005. Smith claims she was unable to attend the February 4th hearing because her mother had been admitted into the hospital shortly before she was to leave for the hearing. Smith argued at the second hearing that her mother was admitted to the hospital the day before the hearing scheduled for February 4th. Smith's paralegal[1] apparently contacted the court by phone shortly before the end of the work day on February 3rd to request a continuance. The chancellor told this person she should contact opposing counsel, and that he (the chancellor) required more information before considering the request for a continuance. On the other hand, we find in the record, including an affidavit submitted by Smith, evidence that Smith's mother was actually admitted to the hospital on February 2nd. Smith never formally filed a motion for a continuance with the chancery court, rather she simply had a copy of her mother's hospital admission papers faxed to the court.

¶4. During the hearing of February 4, 2005, in the absence of Smith and her client, the chancellor granted temporary child custody to the husband because of concerns the court had after hearing testimony from the husband about the child's welfare during the times the child was with the mother. Out of concern for the child's physical safety, the chancellor also issued a handwritten order the same day that the Carroll County Department of Human

[1]Some confusion existed as to whether the person who contacted the court was Smith's sister, working as her secretary. This has led Smith to point out more than once in her pleadings and her brief that she has no sister, but that her mother has worked in Smith's office, and that the two are often confused as sisters.

Services go to the child's home, investigate the child's circumstances, and, if warranted, take the child into custody. The husband, who owned the house, authorized the law enforcement officials to do whatever necessary to enter the home to obtain the child. The mother apparently refused to surrender custody of the child to the Carroll County Sheriff, so the chancellor, believing the child to be in danger, issued an additional order on that same day, this time ordering the Mississippi Highway Patrol to aid the sheriff's department in procuring custody of the child. Evidently, once the law enforcement officials gained entry into the home, they found the mother without the child and arrested the mother on charges of reckless endangerment and kidnaping. The mother was later released on bond. Because the mother refused to obey the court's order by not surrendering the child, or even disclosing the child's location, the husband filed a complaint for contempt against his wife, Smith's client. Process was issued and served on the mother to appear in court on February 16, 2005, for the contempt hearing. The mother, Smith's client, likewise did not attend this second hearing. It was at this second hearing that Smith was found to be in direct criminal contempt for the statements she made to the chancellor.

¶5.    Exactly what had happened after the chancellor issued his several orders following the February 4th hearing is not entirely clear. Apparently Smith, despite being unable to travel to court on the day of February 4, 2005, had maintained telephone contact that day with both her client and the court, while law enforcement officials surrounded the mother's home in their attempts to locate the child. The chancellor understood Smith as trying to

4

procure an agreement that her client would come out of the home if she could be guaranteed that she would not be arrested by the law enforcement officials. When the court demanded to know the location of the child, Smith was non-responsive and evasive. Smith admits these facts in her brief to this Court. Smith also admits that she understood the chancellor to believe she was interfering in a police situation and was thus endangering her license to practice law. The chancellor also warned Smith that the consequences may be even more severe if she were helping to hide the child. Later, the mother was arrested on charges of reckless endangerment and kidnaping, but she was thereafter bonded out of jail by her parents. After Smith's client was released, Smith set a time frame within which her client was to surrender the child, but Smith's client did not honor this time frame. Smith claims she has had no dealings whatsoever with her client since that time. Smith later filed a motion to withdraw as counsel.[2] The chancellor denied this motion to withdraw on February 11, 2005. Smith claims in her brief that her client then retained attorney Dennis Baker as counsel, which fact was verified by opposing counsel at the second hearing, wherein opposing counsel revealed to the court discussions with Baker in attempts to come to an agreement with Baker. Apparently, Baker later told opposing counsel that he (Baker) was not counsel of record, and

---

[2]Smith stated in her motion, "[u]nder Rule 1.16 of the ABA Modern (sic) Rules where representation has commenced a lawyer shall withdraw from the representation." Mississippi Rule of Professional Conduct 1.16 prevents a lawyer's representation of certain clients if one of three conditions exists. The rule also allows a lawyer to withdraw from representation, once it has commenced, under any of the same conditions. Smith never attempted to show those conditions, or even quote that portion of the rule.

5

that he was not going to represent the mother or have anything further to do with her after instructing her to return the child. It appears from the record that the child was evidently returned the day before the contempt hearing.

¶6.     Smith would later claim that her first notice that she was still required to attend the February 16th hearing was around 5:00 p.m., on the day before the contempt hearing, when the chancellor personally telephoned Smith. However, in her brief, Smith admits that earlier in the day on February 15th, she called the court herself and learned the hearing was scheduled for the next day, despite the personal notice served on her client. Smith also admits in her brief that she received notice of the denial of her motion to withdraw as counsel on February 14th, two days before the contempt hearing of her client. Smith claims that during their telephone conversation, the chancellor lost patience with Smith and told her she had better be in court the next day or he would send the sheriff to physically bring her to court. Smith then prepared and filed an answer to the contempt petition against her client and a motion for the chancellor to recuse himself. At the beginning of the contempt hearing the next day, Smith asked to have her recusal motion heard first.

¶7.     At the outset of the second hearing, Smith stated to the court that her appearance there was under protest and threat of coercion. After the chancellor gave Smith an opportunity to respond to her opposing counsel when she presented her motion for recusal, the following exchange took place.

>  BY THE COURT:  All right.  Ms. Smith, you may respond, and I
>  understand your client is not here today.

6

BY MS. SMITH: Your Honor, my first response, if it please the Court --

BY THE COURT: (Interposing) Is your client here today?

BY MS. SMITH: I do not see her present in the Courtroom.

BY THE COURT: Do you know where she is?

BY MS. SMITH: No, sir.

BY THE COURT: Have you had communication with her today?

BY MS. SMITH: No, sir.

BY THE COURT: Did you have communication with her yesterday?

BY MS. SMITH: No, sir.

BY THE COURT: Was she aware she's supposed to be in Court today?

BY MS. SMITH: To the best of my knowledge, no.

BY THE COURT: Was she served with a summons?

BY MS. SMITH: I've never seen one.

BY THE COURT: My information is, she was served and the return is in the documents in the Court file.

BY MR. GWIN: Yes, sir.

BY MS. SMITH: Mr. Gwin has had the Court file. I have not had a privilege to see it.

BY THE COURT: Okay. But, at any rate, she's not here today. You may continue.

BY MS. SMITH: Thank you, Your Honor. As Your Honor is aware, I have filed a motion for a change of venue within the motion for recusal. With all due respect to the Court, I believe that the actions of this Court have been *so* reprehensible as to disgust any Court, and I ask that this Court be changed, either the Judge, or at least the venue to change, and that is before the Court today.

BY THE COURT: I'll rule on that now. I want you to put on some proof to that effect.

BY MS. SMITH: Your Honor, my client is not here today; however, I believe that the Court records do, in fact, show that there have been handwritten orders by this Court where this Court, with, I'm told, thirty years experience on the Bench knew very well that he did not designate this child as endangered; he did not have probable cause in order to enter a house to demand that that child be removed from the house; he had no reason to believe that that child was in the house, because I assured Mr. Gwin, and I believe I assured Your Honor when we were on the phone with what we all believed to be a hostage situation, that that child was not there. I believe that Your Honor circumvented the law that exists by asking DHS to do his work for him. DHS was originally instructed to go out, but it was with the police department.

7

When you involved a police department, you created a situation in which there was a custody; not custody of the child, I'm talking about custody of an adult, preventing that adult from leaving, preventing that adult from having the freedoms that we have here in the United States. With all due respect, this Court ignored the basic freedom given to any person, and this is a Court of equity. This Court took testimony, as exampled by the defense -- excuse me, by the Plaintiff's attorney today. Heard testimony, knowing full well that I could not be here on February 4th. In a private conference with Your Honor over the telephone, I will state before this Court as an officer of the Court that I was discouraged; that I felt threatened; that I believed that Your Honor was not only sarcastic, but failed to recognize that I had a member of my family in the hospital, failed to take that into consideration, and acted on his own as the orders that have already been established by this Court start out to say. On the Court's own motion that you had nothing more than allegations before you. The child was never ruled endangered. The child was never ruled as in need of supervision. You didn't put that in the order. I believe that by further going on in later orders -- in fact, I think there were five within one day; I've never seen that. Now, maybe in thirty years, I'll be able to say I've seen it more than once, but with all due respect to the Court, things were transpiring so quickly and spiraling based upon what Your Honor started.

That child wasn't found in the house. That child was never in danger *in that house*. Kristie Hunt had every right to be in that house. It was her marital residence. She didn't have to come out. This man is a reserve officer. He knows the laws. He'd better know the law of probable cause. He also knows there was a domestic violence charge against him. Conviction of it means he doesn't get to carry a firearm anymore. He doesn't even get to go hunting anymore. He had a lot to lose. So, based on his sole testimony alone, Your Honor still didn't decide that that child was an endangered child, and you sent the DHS out to investigate. DHS, I believe, faced the same intimidation that I've faced in order to be here today. They have to come in here and deal with you on a regular basis. If you send them out there and you say, "Go check; I'm concerned about that child," they're going to come back and they're going to tell you, "I'm concerned about that child." And then we started the second spiral when DHS says they're concerned about it. The sheriff's already out there. She's not letting them into the house, and you gave the sheriff an order at that particular point to use all means necessary to enter a house? Believe it or not, the sheriff didn't stand on that. The sheriff was at least smart enough to know what probable cause is, and he knew he didn't have it, so he came back to you and he said, "Write an order, Judge," and in one of the orders, it says, "I've been asked by the sheriff..." You didn't say, even then,

8

that you found the child to be in danger. You had no probable cause to force that woman to exit her house. She didn't have custody of the child. She didn't have physical possession of that child at that point.

I believe that the further orders in which Your Honor has just bypassed the Court proceedings and designated this man as the father shows what you told me in conversations and what I would profess before this Court, as an officer of the Court, that you have already decided this case; that you have already decided that not only is he the father, but he's going to get permanent custody. That's good for him.

Kristie came to me with the thought that she could not get a good hearing here, a fair hearing here, and I took it with a grain of salt, but I should've realized that someone traveling from Carroll County all the way over to Washington County had a reason. There is a child involved here. This Court can be overturned at a later time. The Supreme Court has done that. Even where the father has held custody of the child for three years, the Supreme Court has, in fact, gone back and overturned situations saying it was wrong to begin with. We're going to make the Chancellor go back and look at it again, and the Chancellor, at that particular point, said, "Okay. I'm giving the child to the mom." Well, then, Dad took it up to the Mississippi Supreme Court at that particular point, and the Supreme Court said, "Well, we didn't say that the Chancellor shouldn't recognize that those next three years were spent with Dad." In the meanwhile, the child's with the mom for a considerable period of time. I don't want that to happen here. I don't believe that an eleven-month-old child should be tossed back and forth while the judiciary is deciding the issues that have already come before it.

Now, I've never met you before, I have no reason to question, before this case, but as an officer of the Court, I know that I was threatened. I know that when we were in a hostage -- what we all believed to be a hostage situation caused by Your Honor that I was threatened by Your Honor that if you did not tell me where that child was... -- if I did not tell you where that child was, which I had no knowledge of at that point and couldn't, that you were going to do everything in your power to get rid of my Bar license, to put me in jail. I'm trying to negotiate when a SWAT team's outside! I did not find that to be appropriate. You got to the point later on in saying that conversation -- this whole conversation is inappropriate. Well, it was, but the point was, a life was at stake, and it wasn't the child's.

I'm concerned at the precedent this sets, so concerned that I realize it's confidential, but that I have already contacted the Mississippi Commission on Judicial Performance. Now, they're the ones who told me Your Honor's

9

retiring, and the Internet confirmed it, but I can't believe that you've done this. I cannot believe that.

> BY THE COURT: Ms. Smith, I'm going to give you an opportunity to withdraw and apologize for what you've said to the Court today.

> BY MS. SMITH: Sir, I stand on what I have presented to the Court.

> BY THE COURT: Okay. This is a direct contempt hearing. What you say about the Court, many of those facts are untrue. They're downright falsehoods of what the Court has said and done. Your attitude has continually been contemptuous of the Court on the phone. Your attitude today is contemptuous of the Court. Do you have anything to say in your defense, because this is a direct contempt hearing, other than what you've said?

> BY MS. SMITH: I regret that Your Honor has perceived my testimony before this Court in that manner.

> BY THE COURT: Okay. The Court finds you in contempt, orders that you be directly incarcerated for five (5) days in jail, and you're in the custody of the sheriff.

¶8.    Smith was placed in the county jail for two nights until a post-contempt status hearing was held on February 18, 2005, at which time the chancellor gave Smith an opportunity to apologize, which she refused to do in what the chancellor perceived to be a genuine and sincere manner. Afterward, Smith completed serving the three days remaining on her sentence. The chancellor, on his own motion, later recused himself. Smith later filed a motion for relief from judgment with the chancery court after learning of the recusal, but also after filing notice of the appeal to this Court. Smith, representing herself, now appeals the conviction of direct criminal contempt. Smith raises five issues, some of which we find to be irrelevant, and none of which have any merit.

### DISCUSSION

¶9.    When this Court reviews cases of criminal contempt, the standard of review is ab initio. *Brame v. State*, 755 So. 2d 1090, 1093-94 (Miss. 2000) (citing *Terry v. State*, 718 So.

10

2d 1097, 1103 (Miss. 1998)). "[T]his Court proceeds ab initio to determine whether the record proves the appellant guilty of contempt beyond a reasonable doubt." ***Purvis v. Purvis***, 657 So. 2d 794, 797 (Miss. 1994) (citing ***Lamar v. State***, 607 So. 2d 129, 130 (Miss. 1992)). The burden of proof to establish that contempt has been committed is on the party asserting that contemptuous conduct has occurred. ***In Interest of Holmes***, 355 So. 2d 677, 679 (Miss. 1978). In a proceeding for criminal contempt, evidence of guilt must be established beyond a reasonable doubt. ***Id.***

**I.     WHETHER QUESTIONS OF JURISDICTION OVER SMITH'S CLIENT OR THE ACTIONS OF PLAINTIFF'S COUNSEL EXONERATE SMITH OF HER ACTIONS.**

¶10.    Smith attempts to frame the first three issues as assignments of error on the part of the chancellor concerning jurisdiction, and on the part of her opposing counsel for not informing the trial court of her personal situation, or of the possibility of new counsel. Smith first claims the chancery court had no jurisdiction over Smith's client because of the possibility of improper service, framing the issue this way: "[w]hether the court had jurisdiction over the defendant such that any hearing temporary or otherwise would be held." In her second assignment of error, Smith in essence claims that her opposing counsel was engaged in ex parte communications with the chancellor to gain a tactical advantage, framing the issue this way: "[w]hether plaintiff's counsel was obligated [to] act with candor to the tribunal and at all times whether such violation of same fueled the fire for the events that transpired on February 16, 2005." In her third assignment of error, Smith claims her opposing counsel was

11

at fault for not disclosing to the court information about Baker, the attorney who supposedly replaced Smith, framing the issue this way: "[w]hether plaintiff's counsel was obligated to immediately advise the court and counsel of record for the defendant that the defendant had sought, hired and received advise (sic) from new attorney. Ms. Smith could not have been representing the defendant at the time the court demanded Ms. Smith's presence, thus the plaintiff's attorney had the last opportunity to avoid the events which transpired on February 16, 2005."

¶11. Each of these "issues" lacks merit, clarity, and citations to supporting case law. Smith's few citations to the Mississippi Professional Rules of Conduct are irrelevant. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Byrom v. State*, 863 So. 2d 836, 863 (Miss. 2003) (citing *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001)). "This Court has held that it is the duty of an appellant to provide authority and support of an assignment. If a party does not provide this support this Court is under no duty to consider assignments of error when no authority is cited." *Hoops v. State*, 681 So.2d 521, 526 (Miss. 1996) (internal citations omitted). Attempting to decipher exactly which errors Smith argues occurred at the trial level is difficult. First, questions of jurisdiction over her client and proper service of process on her client are entirely irrelevant in this case. The matter before us now on appeal are Smith's charges of direct criminal contempt of court. Smith was in no way relieved of her duty as an attorney to be respectful to the court by questions of jurisdiction or proper service of process. As to Smith's second

12

and third assignments of error, opposing counsel in this case was simply not at fault for failing to disclose any pertinent fact to the chancellor. The facts that Smith's mother had been admitted to the hospital and that her client had contacted a new attorney were already known to the court. While it is true that Smith filed a motion to withdraw as counsel of record, it is also true that her motion to withdraw was denied by the chancellor. Smith thus continued to be the attorney of record representing the mother, and Smith should not have assumed otherwise since her motion to withdraw was denied. In any case, Smith, as an officer of the court, was never given license to stray from her charge and ethical responsibilities as a lawyer. The questions of whether the facts Smith considered pertinent to her first three issues were known by the trial court, or whether her opposing attorney was obligated to disclose these facts to the chancellor have no bearing whatsoever on the issues presented by this appeal. Thus, these "issues" are without merit.

## II. WHETHER THE CHANCELLOR'S FINDING OF SMITH'S CRIMINAL CONTEMPT SHOULD HAVE BEEN CONSTRUCTIVE AND NOT DIRECT, AFFORDING HER MORE PROCEDURAL SAFEGUARDS.

¶12. Smith frames her next two assignments of error in this way: "[w]hether the court failed to provide procedural due process to Ms. Smith, the defendant's counsel when Ms. Smith was charged and convicted of direct criminal contempt" and "[w]hether the trial judge erred when he found defense counsel in direct contempt of court." After attempting to glean a coherent argument from Smith's briefs, we have determined that Smith evidently argues that the judge actually found her in constructive contempt of court, and not direct contempt

13

of court, because his basis for doing so seems to include her actions which occurred outside the presence of the court. If this were the case, Smith would indeed be due more procedural safeguards than she was given in this case.

¶13. The analysis for determining the type of contempt before the Court was set out by this Court in *Cooper Tire & Rubber Co. v. McGill*, 890 So. 2d 859, 868-69 (Miss. 2004). Contempt convictions are to be carefully examined. *Melvin v. State*, 210 Miss. 132, 48 So. 2d 856 (1950). "Generally speaking, contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than we are." *Cumberland v. Cumberland*, 564 So. 2d 839, 845 (Miss. 1990). The first question is whether the contempt is civil or criminal in nature, which we determine by looking at the primary purpose of the contempt order. *Cooper Tire*, 890 So. 2d at 868. "If the primary purpose of the contempt order is to enforce the rights of private party litigants or enforce compliance with a court order, then the contempt is civil. The contemnor may be jailed or fined for civil contempt; however, the contemnor must be relieved of the penalty when he performs the required act." *Id.* (citing *Purvis v. Purvis*, 657 So. 2d 794, 796-97 (Miss. 1994)). In a case of civil contempt, we would be bound by the manifest error rule. *Id.* If, however, the order is designed to punish the contemnor for disobedience of a court order, the contempt is criminal and punishment does not terminate upon compliance with the court order. *Common Cause of Miss. v. Smith*, 548 So. 2d 412, 415-16 (Miss. 1989). A judge issues a citation for

14

criminal contempt to vindicate the dignity and authority of the court. This is proper only when the contemnor has wilfully, deliberately and contumaciously ignored the court, or the court's directive. *Premeaux v. Smith*, 569 So. 2d 681, 684 (Miss. 1990) (citing *Cooper v. Keyes*, 510 So. 2d 518, 519 (Miss. 1987)). "This Court is not bound by the manifest error rule when the appeal involves a conviction of criminal contempt. Instead, this Court proceeds ab initio to determine whether the record proves the appellant guilty of contempt beyond a reasonable doubt." *Purvis*, 657 So. 2d at 797. *See also Lamar*, 607 So. 2d at 130; *Premeaux*, 569 So. 2d at 683-84; Miss. Code Ann. § 11-51-11 (Supp. 1994) (general statute pertaining to contempt appeals). In this case, the contempt was clearly criminal, as the chancellor's order was to punish Smith for her words and to vindicate the dignity and authority of the court, not to enforce the rights of any of the litigants.

¶14. We further discussed the two forms of criminal contempt, direct and constructive, in *In re Williamson*, 838 So. 2d 226 (Miss. 2002).

> Direct criminal contempt involves words spoken or actions committed in the presence of the court that are calculated to embarrass or prevent the orderly administration of justice. Punishment for direct contempt may be meted out instantly by the judge in whose presence the offensive conduct was committed....
> Unlike direct contempt, constructive contempt involves actions which are committed outside the presence of the court ... In the case of constructive criminal contempt, we have held that defendants must be provided with procedural due process safeguards, including a specification of charges, notice, and a hearing.

*Id.* at 237 (citations omitted). Because the trial judge elaborated somewhat at the February 16 hearing about actions of Smith that occurred outside the court, Smith apparently argues

15

now that she should have actually been charged with committing constructive, and not direct, criminal contempt. If Smith's actions actually constituted constructive criminal contempt, her due process rights would guarantee her more than the immediate sentence she received, including a different judge to hear the contempt proceedings. "As noted, a person charged with constructive criminal contempt is afforded certain procedural safeguards. The citing judge must recuse himself from conducting the contempt proceedings involving the charges." *Cooper Tire*, 890 So. 2d at 869. "[I]t is necessary for that individual to be tried by another judge in cases of constructive contempt where the trial judge has substantial personal involvement in the prosecution." *In re Williamson*, 838 So. 2d at 238 (citing *Terry v. State*, 718 So. 2d 1097 (Miss. 1998)). However, this is not remotely close to being a case of constructive contempt; therefore, Smith was not due more than the hearing she received, and she was thus not denied any due process protections.

¶15.   We have held that a charge of contempt of court consists of words spoken or acts done in the presence of the court which tend to embarrass the court or prevent the orderly administration of justice. *Jordan v. State*, 216 Miss. 542, 62 So. 2d 886, 888 (1953). More specifically, direct criminal contempt "may consist of an open insult, in the presence of the court, to the person of the presiding justice, or a resistance to or defiance of power of the court." *Neely v. State*, 98 Miss. 816, 54 So. 315, 316 (1911). No shortage of Mississippi case law exists defining direct criminal contempt as such. "[D]isorderly conduct in the court room, or the use of violence, or threatening, or insulting language to the court, witnesses, or

16

counsel is contempt." *Id.* A contempt which is direct, in the immediate presence of the court, may be summarily punished without affidavit, pleading or formal charges. *Varvaris v. State*, 512 So. 2d 886, 887-88 (Miss. 1987). *See also Miss. Bar v. Lumumba*, 912 So.2d 871, 880-82 (Miss. 2005); *Lumumba v. State*, 868 So. 2d 1018, 1020 (Miss. Ct. App. 2003); *Thomas v. State*, 734 So. 2d 339, 341 (Miss. Ct. App. 1999). Finding another factual scenario that fits more squarely within the law than this one is hard to imagine. Smith's openly disorderly conduct before the chancery court is clear. Smith used insulting language and was displaying both a resistance to, and a defiance of, the appropriate power and authority of the court. She chose to use words in the presence of the court which can easily be said to have a tendency to embarrass or prevent the orderly administration of justice.

¶16. We do not doubt the existence of Smith's passionate concern for her client or that Smith believed she was acting in the best interests of her client, notwithstanding that the chancellor disagreed with what the best interests of the child were. Smith acted as she did almost certainly because of what she perceived to be an unwarranted siege by law enforcement on February 4. Though this might have been cause for her immediate action on that day, her continued defiance and hostility toward the chancellor almost two weeks later clearly constitutes contempt. The chancellor's finding her in contempt was based solely on her words and behavior at the February 16 hearing. The chancellor felt it necessary to provide some record of the relationship between Smith and the chancery court, as well as the behavior displayed by each in the events leading up to the hearing. Her words, after all, were

17

describing the court's actions and those events. However, the chancellor's reasons for finding Smith in direct criminal contempt had little to do with the pre-hearing events, which at that point had essentially become irrelevant, but had everything to do with Smith's actual words in open court referring to the court as reprehensible and disgusting. This was made even more clear on the post-contempt status hearing two days into Smith's sentence, where the judge made it clear that the keys to the jailhouse door were in her hands, and that he would gladly release Smith from her sentence if she were willing to apologize to the court for those specific words.

> BY THE COURT: You made a statement, something to this effect, addressed to the Court: "This Court has been so reprehensible as to disgust any Court." You're directly calling the Court reprehensible and disgusting. Do you apologize for that?
> BY MS. SMITH: I believe that is language quoted with the Mississippi Supreme Court with which to address case law in --
> BY THE COURT: (Interposing) Do you apologize?
> BY MS. SMITH: Perhaps I did not have any authority --
> BY THE COURT: (Interposing) Do you apologize?
> BY MS. SMITH: In other circumstances, I might have used other words.
> BY THE COURT: Do you apologize?
> BY MS. SMITH: What is it you want me to apologize for?
> BY THE COURT: I said for those words.
> BY MS. SMITH: For those words. In other circumstances, I might have used other words.
> BY THE COURT: Okay. Well, I think there's no need to go further. I really wanted to let you out of there, that confinement. I really did. I was hoping you'd have some change of heart, but I can't see it.

¶17.    As mentioned, Mississippi case law is clear that this court will conduct an ab initio review for an appeal of a criminal contempt conviction and determine "whether on the

18

record, the contemptor (sic) is guilty beyond a reasonable doubt." ***Premeaux v. Smith***, 569 So. 2d 681, 683-84 (Miss. 1990). The transcripts of both hearings on February 16[th] and February 18[th] leave no room for doubt. Because the record unquestionably reveals, beyond a reasonable doubt, that Smith was guilty of direct criminal contempt, we find this issue to be without merit.

## CONCLUSION

¶18. Finding no error in the chancellor's judgment of direct criminal contempt entered against Susan C. Smith, we affirm the judgment of the Chancery Court for the First Judicial District of Carroll County.

¶19. **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, GRAVES AND DICKINSON, JJ., CONCUR. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**