DICKINSON, Justice,
for the Court.
¶ 1. The Mississippi Department of Human Services in Hinds County (“DHS”) received two reports involving a thirteen-year-old boy, E.K. In the first, E.K. was accused of having sexually molested a three-year-old girl, and in the second, E.K. alleged he was the victim of statutory rape at the hands of L.S., the three-year-old girl’s mother.
¶ 2. During a shelter hearing regarding the allegations that E.K. had been abused by L.S., the judge ordered E.K. to submit to an interview with the Child Advocacy Center (“CAC”), and the trial judge ordered L.S. to have no contact with E.K. or his mother, P.K. The guardian ad litem then asked P.K., “Do you understand that the purpose of the CAC interview — they will interview him,” to which P.K. responded, “Yeah.”
¶ 3. On the day the CAC interview was scheduled, P.K. accompanied E.K. to the interview. P.K. and E.K. entered the CAC and completed the required paperwork. Then, P.K. and E.K. left the building and sat in P.K’s car. When Brandy Kelly, the DHS agent assigned to the case, contacted P.K. on her cell phone to tell her the interview was about to begin, P.K. replied that she and E.K. were “doing our rosary” and would return to the office when they completed it.
¶ 4. Once P.K. and E.K. returned inside the CAC for the interview, P.K. began to say that she did not want E.K. to have the interview. P.K. also stated that E.K.’s father was on the way, and continued to insist that E.K. not have the interview. Kelly explained to P.K. that if she did not allow E.K. to have the CAC interview, she would be in violation of a court order. P.K. then called her attorney, who informed Kelly that if Kelly did not have the court order with her, E.K. would not participate in the interview. Accordingly, P.K. and E.K. left the CAC.
¶ 5. After these events were reported to the judge, he verbally ordered Kelly to remove E.K. from his mother’s custody. The sheriffs department picked up E.K. from P.K., after which Kelly learned that E.K. had been instructed by his mother not to talk to her. Another shelter hearing was held the following day, during which Kelly stated that CAC interviews are:
where we are able to obtain the information — the time line in which the events took place as far as sexual abuse or physical abuse, and it’s very mandatory for us to obtain that interview. That’s the child’s way of telling what happened.
Kelly also stated that neither parents nor lawyers were allowed in the room during interviews “because they can coach the child and ruin the whole interview, or the child could shut down and not disclose anything.”
¶ 6. Kelly opined that damage had been done because P.K. and E.K. abruptly had left the CAC before allowing E.K. to be interviewed. In her opinion, “when [P.K.] *1219 took [E.K.] out to the car, I feel as if she told him not to say anything.” Kelly testified that, “This child has been coached.” Furthermore, Kelly added that E.K. “disclosed to neighborhood children that [he] and his mother made up this story because he supposedly had touched a three-year-old child and that if he sticks to the story, when the investigation is over, he’s supposed to get paid for it.” Kelly then requested that the court issue a no-contact order between P.K. and E.K. through the remainder of the investigation, and leave E.K. in the custody of DHS.
¶ 7. After Kelly completed testifying, the trial judge addressed P.K., who was unrepresented by counsel at the hearing, saying:
[P.K.], you have an opportunity to make a statement now if you want to do so, and I want to caution you on how this works. You have to be sworn in, and once you get through making your statement, then you are subject to cross-examination from the county prosecutor ... and the guardian ad litem, who represents E.K. in this case[.] ... Do you understand?
P.K. responded, “Yes, sir,” and explained the facts leading to the sexual-abuse charges. She did not, however, explain the events surrounding the CAC interview.
¶ 8. The guardian ad litem asked P.K. if she “allow[ed] this child to be interviewed at CAC,” to which she responded, “I did not.” P.K. then adamantly denied knowing the court had ordered that E.K. have the interview at CAC. The guardian ad litem asked, “Well, why was there testimony presented today that you called some lawyer, and your lawyer mentioned that if the court order was not present at the CAC interview, that the child couldn’t have [the interview] — if you didn’t know there was an order?” P.K. responded by saying, “Ms. Kelly told Mr. McNeal [P.K’s lawyer] that it was a court order and the court order was in her mailbox, so them two had a conversation. I did not know.”
¶ 9. The guardian ad litem then addressed P.K. and the court, saying:
I believe that you have clearly and purposely frustrated the attempts for this child to be interviewed by CAC. There’s a purpose for those interviews. There’s a purpose for a child being interviewed alone without the parent being there, so the child is not coached or coerced, so that the child can fully disclose. Number one, I believe that you clearly frustrated on purpose. Number two, I clearly believe that you would bring up this whole story for your own personal benefit. What I’m asking this Court to do is lock you up today, because you are clearly in contempt of this Court. There’s no question about it. There’s no question about it, and I do believe that you are not going to do anything but try to further frustrate this process. My recommendation, number one, is that you are locked, up today. Number two, I ask that when you are released, that you have no contact tuhatsoever with this child.
(Emphasis added.) The guardian ad litem further requested that E.K. remain in DHS’s custody; that a no-contact order be issued between P.K. and E.K.; and that P.K. be made to submit to “psychological counseling, psychological testing, psychological analysis, examination, assessments, whatever.” The guardian ad litem also stated, “I have a fear for this child’s well-being.”
¶ 10. The prosecutor and the trial judge had a discussion as to whether the request by the guardian ad litem was for civil or criminal contempt, and whether notice to P.K. was required. The trial judge concluded that “because youth court cases are in fact civil,” that P.K. could be placed in custody, charged with contempt, and jailed *1220 for forty-eight hours. A contempt-of-court order was entered April 4, 2008. Further, legal and physical custody of E.K. was placed with DHS.
¶ 11. P.K. filed an appeal with this Court, claiming she had been held in constructive criminal contempt, and that because she had no notice of the proceedings, her constitutional due process rights were violated. She asks this Court to “set aside the complete [contempt] order, including but not limited to [the trial judge’s] commands that E.K.’s mother ‘enter into and complete [a] service agreement to include full psychological evaluation and drug testing and parenting classes before [she is] allowed even visitation with [E.K.].’ ”
DISCUSSION
¶ 12. The parties dispute whether the contempt matter at issue is a civil contempt or a constructive criminal contempt. This Court has stated:
In classifying a finding of contempt as civil or criminal, this Court focuses on the purpose for which the power was exercised. On appeal, the trial court’s classification is not conclusive. Thus, the determination should focus on the character of the sanction itself and not the intent of the court imposing the sanction_ Generally speaking, contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than the Supreme Court.... If the primary purpose of the contempt order is to enforce the rights of private party litigants or enforce compliance with a court order, then the contempt is civil.
Cooper Tire & Rubber Co. v. McGill, 890 So.2d 859, 867-868 (Miss.2004) (quoting In re Williamson, 838 So.2d 226, 228 (Miss. 2002)) (internal citations omitted) (emphasis added).
¶ 13. The matter at issue was a civil contempt matter, the purpose of which was to ensure that E.K. underwent the CAC interview without interference from his mother. The order states, “[P.K.], having admitted to interfering with the interview by the [CAC] and an investigation by [DHS] of these claims shall be held in civil contempt until the completion of the scheduled interview by the [CAC] and until [DHS] can complete its investigation further in these premises.” We cannot say from the record before us that the purpose of the contempt order was to punish P.K. for wrongdoing.
¶ 14. The dissent argues that the contempt order characterizes the mother’s actions as “willfully, deliberately and contumaciously ignorfing] the court,” as contemplated in In re Smith, 926 So.2d 878, 887-88 (Miss.2006), and that the court punished P.K. for past conduct. The order, however, is plain on its face, and we cannot say the trial judge’s intent in holding P.K. in contempt was not to further DHS’s investigation and enforce compliance with the court’s order for E.K. to undergo the CAC interview.
¶ 15. In Cooper Tire, this Court further stated:
The contemnor may be jailed or fined for civil contempt; however, the contem-nor must be relieved of the penalty when he performs the required act. Criminal contempt penalties, on the other hand, are designed to punish the con-temnor for disobedience of a court order; punishment is for past offenses and does not terminate upon compliance with the court order.
Cooper Tire & Rubber Co. v. McGill, 890 So.2d 859, 868 (Miss.2004) (quoting In re Williamson, 838 So.2d 226, 228 (Miss. *1221 2002)) (internal citations omitted). Here, the trial court orally ordered P.K. to spend forty-eight hours in jail and further stated in the written order that, “In the event that the interview by the [CAC] cannot be reschedueld and/or the investigation cannot be completed within a period of forty-eight hours, [P.K.] shall be released but ordered not to further interfere with the ongoing investigation or face further sanctions before this Court.” Prior to the order, Kelly testified that E.K. had another CAC interview scheduled “within a couple of days.”
¶ 16. Although the trial court orally ordered P.K. to spend forty-eight hours in jail, the contempt order required that P.K. be held “until the completion of the scheduled interview by the [CAC] and until [DHS] can complete its investigation further in these premises.” The written order further stated that P.K. could be released if the interview could not be completed within a forty-eight-hour period, but that she would be “ordered not to further interfere with the ongoing investigation or face further sanctions.” With these facts in mind, we cannot say that the purpose of P.K’s incarceration was not to ensure the CAC interview was completed, nor can we say that the forty-eight-hour time period was based on anything other than Kelly’s testimony that an interview would be scheduled “within a couple of days.”
¶ 17. Having determined that the contempt at issue is civil in nature, we now must look to the standard of review. This Court has stated:
When dealing with contempt matters, we must first determine whether the alleged contempt is either civil or criminal in nature. If the contempt is civil, the proper standard utilized for review is the manifest error rule. If the contempt is criminal, then we will proceed ab initio and will determine on the record whether the person in contempt is guilty of contempt beyond a reasonable doubt.
Cooper Tire & Rubber Co. v. McGill, 890 So.2d 859, 868 (Miss.2004) (internal citations omitted). Therefore, because this is a civil contempt matter, the standard of review is manifest error.
¶ 18. P.K. cites authority which addresses notice requirements for criminal contempt. As discussed above, this is a civil contempt matter and this Court has stated, “One may be jailed or fined for civil contempt.” Purvis v. Purvis, 657 So.2d 794, 796 (Miss.1994).
¶ 19. P.K. cites In re Holmes, 355 So.2d 677 (Miss.1978), in which a mother was found to be in contempt of court for appearing at youth court without her son although previously ordered to arrive with him. The mother was ordered to be incarcerated in the county jail “until said child is brought before this Court, or until the further Orders of this Court.” Id. at 678. Clearly, this was a civil contempt order, the purpose of which was to have the woman’s juvenile son appear in court. However, the Holmes court incorrectly analyzed the matter as a constructive criminal contempt case, and therefore the propositions for which it is cited are inapposite.
¶ 20. At oral argument, P.K’s counsel stated that, because DHS had custody of E.K., there was no need to jail P.K. to ensure the CAC interview was conducted and, therefore, the contempt order was punitive in nature. The record provides no insight, however, as to P.K’s ability— or lack thereof — to contact E.K. while he was in the custody of DHS. Stated another way, we cannot assume that placing E.K. in DHS’s custody assured no contact.
¶ 21. P.K. further argues that Judge Skinner “should have allowed anoth *1222 er judge to preside over the constructive criminal contempt matter,” and cites Purvis, 657 So.2d at 798, for the proposition that a judge needs to recuse himself when “common sense leads to the conclusion that it was unlikely that the [judge] maintained the detachment necessary for making an unbiased and fair decision.” Again, the Purvis matter was a criminal contempt matter and is inapposite here. Furthermore, a quick review of the facts in Purvis demonstrates that the case before us today is easily distinguishable. The relevant facts in Purvis are as follows:
Sammy Purvis filed a pro se motion seeking recusal of the chancellor. When Purvis failed to bring the motion on for hearing, the court did so on its own motion. At the hearing on Sammy Pur-vis’ motion to recuse, wherein Purvis represented himself, Chancellor Clapp read each paragraph of the motion. Paragraph six in the motion for recusal stated that the chancellor did, not have the “mental capacity to knqtv right from wrong and [ivas] in dire need of psychiatric help. ” Paragraph seven complained that the court “has demonstrated that it does not know how to interpret the laiv or follow it....” Paragraph nine concluded that “because the chancellor has no experience in chancery law that [sic] the court system has virtually broke down with the back log of cases, ” and Purvis requested “that one of the Special Masters be brought in to try to restore some resemblance of justice.” Upon reading the motion, the chancellor asked if Purvis had anything to add regarding each allegation. Pmvis expanded on his allegations and made the remark that he had “suspicions as to what’s going on” because his wife had said “she could, get anything she wanted from Roger [Chancellor Clapp'J” Pur-vis also included remarks about having provided the Attorney General’s office with information which allegedly prompted an investigation of Chancellor Clapp, and having filed two complaints regarding Chancellor Clapp with the Judicial Performance Commission which would in turn require his recusal from Purvis’ divorce proceeding. Finally, Purvis questioned Clapp’s ability to preside over domestic matters and expressed his desire for a “veteran judge.” Purvis concluded by stating, “I don’t think nobody other than Jesus Christ could possibly be fair after the things we have just went over. I don’t believe there’s a human being that could possibly-which I’m sure this probably insulted you to some extent to be read in front of these people that you weren’t with.”
Purvis, 657 So.2d at 795-796 (emphasis added). Nothing in the record of the present matter leads to the conclusion that it was unlikely that the Judge Skinner “maintained the detachment necessary for making an unbiased and fair decision.”
¶ 22. Finally, P.K. requests we set aside the complete contempt order — including Judge Skinner’s command that she “enter into and complete [a] service agreement to include full psychological evaluation and drug testing and parenting classes before [she is] allowed even visitation with [E.K.].” A review of the record reveals that this command is not included in the contempt order, nor is it directly ordered in the judge’s oral statements from the bench. The trial judge conditioned such requirements on law enforcement officers making a determination as to whether or not P.K. had perpetrated a fraud against the court by filing a false claim. From the record before this Court, it appears that P.K. is not presently required to undergo such evaluation, as there is no order or finding in the current record that P.K. had, in fact, perpetrated a *1223 fraud on the court. Therefore, the command that P.K. enter a service agreement and obtain psychological and other evaluations is not presently a pending issue.
¶ 23. The dissent addresses two issues raised by neither party: jurisdiction and Fifth Amendment implications. The dissent is correct that jurisdiction is granted to the youth court by Mississippi Code Section 43-21-151 and includes “all proceedings concerning ... an abused child.” Miss.Code. Ann. § 43-21-151(1) (Rev. 2009). An “abused child” is defined in the Act as:
a child whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child sexual abuse, sexual exploitation, emotional abuse, mental injury, nonaccidental physical injury or other maltreatment. Provided, however, that physical discipline, including spanking, performed on a child by a parent, guardian or custodian in a reasonable manner shall not be deemed abuse under this section.
Miss.Code Ann. § 43-21-105(m) (Rev. 2009). The abuse alleged by E.K. was at the hands of a neighbor, not his parent. However, a factual determination would need to be made as to whether the alleged perpetrator was temporarily “responsible for his care or support, whether legally obligated to do so or not” at the time of the alleged abuse, or whether P.K. “allowed [the abuse] to be caused” by this neighbor. There is no indication in the record as to whether some or all of the abuse occurred at a time when the mother had requested the neighbor to watch or care for E.K. or whether P.K. allowed the abuse to occur, and a factual determination must be made on these issues. Because the issue was not raised by the parties or the trial court, this Court is not in a position to make such a factual determination.
¶ 24. Similarly, the Fifth Amendment concerns voiced by the dissent were not raised by either party. Furthermore, the record clearly establishes that the CAC interview at issue in the present matter dealt with the allegations that E.K. was a victim of abuse. The interview was not an interrogation to determine whether E.K., himself, was a perpetrator. The dissent’s conclusion that “this interview was nothing more than a subterfuge that sought to acquire a confession or other incriminating statements from the child that he had abused another child” is clearly unfounded in the record.
CONCLUSION
¶ 25. We find that the matter before this Court is a civil contempt action, and we further find no manifest error. In addition, there is no evidence in the record leading to the conclusion that Judge Skinner abused his discretion in failing to re-cuse himself. Therefore, the trial court is affirmed.
¶ 26. AFFIRMED.
WALLER, C.J., CARLSON, P.J., RANDOLPH AND LAMAR, JJ„ CONCUR. PIERCE J., CONCURS IN PART. KITCHENS, J, DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J., AND CHANDLER, J.; PIERCE, J., JOINS IN PART.