KITCHENS, Justice,
Dissenting:
¶ 27. Because the youth court did not have jurisdiction to investigate claims that E.K. was sexually abused, the order compelling the CAC interview was void ab initio, and the mother could not be held in contempt for failure to comply. Yet, even if jurisdiction were proper, because the *1224 mother’s release was not contingent upon her son’s completion of the interview, or upon the completion of DHS’s investigation, incarcerating the mother for forty-eight hours was clearly a penalty for criminal contempt. Most importantly, however,' I find the circumstances surrounding her incarceration troublesome in light of the grave constitutional implications associated with the youth court’s attempt to force interrogation of a criminal suspect. For these reasons, I must respectfully dissent. Jurisdiction
¶ 28. Generally, an alleged contemnor may not defend against failure to comply with a court order by arguing that the order was improper; however, it is a long-recognized defense that the order was void, for example, when the issuing court lacked jurisdiction over the subject matter. Billy G. Bridges and James W. Sheldon, Griffith’s Mississippi Chancery Practice, § 668 (2000 ed.) (citing Tinnon v. Martin, 716 So.2d 604 (Miss.1998); Sinquefield v. Valentine, 160 Miss. 61, 133 So. 210 (1931); McHenry v. State, 91 Miss. 562, 44 So. 831 (1907)).
¶ 29. Mississippi Code Section 43-21-151 grants jurisdiction to the youth court over certain matters, including “all proceedings concerning ... an abused child.” Miss.Code. Ann. § 43-21-151(1) (Rev. 2009). The Youth Court Act defines “abused child” as follows:
“Abused child” means a child whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child sexual abuse, sexual exploitation, emotional abuse, mental injury, nonaccidental physical injury or other maltreatment. Provided, however, that physical discipline, including spanking, performed on a child by a parent, guardian or custodian in a reasonable manner shall not be deemed abuse under this section.
Miss.Code Ann. § 43-21-105(m) (Rev. 2009). The intake order recites that E.K. was under the jurisdiction of the youth court because it was alleged that he was a sexually abused child as defined under the above-quoted code section. However, this definition only contemplates abuse at the hands of a “parent, guardian or custodian or any person responsible for [the child’s] care or support.” Miss.Code Ann. § 43-21-105(m). The basis for the referral to youth court cited in the intake order was that E.K. “wrote a letter stating he was sorry for having sex with a 35-year-old woman. The perp’s name is [A.B.].” It is clear from the record that A.B. was a neighbor, and not a person responsible for the child’s care. As such, this was purely a criminal matter, and the youth court did not have jurisdiction over a case involving allegations of sexual abuse alleged to have occurred outside the child’s home at the hands of an adult with no responsibility for the child’s care or support.[1]
¶ 30. There can be no argument that jurisdiction is an issue that can, and should, be addressed by this Court even if no party has raised the issue. See, e.g., Miss. Mun. Liab. Plan v. Jordan, 863 So.2d 934, 940-41 (Miss.2003) (citing Sanford v. Bd. of Supervisors, Covington County, 421 So.2d 488, 490 (Miss.1982); Home Ins. Co. v. Watts, 229 Miss. 735, 753, 93 So.2d 848, 850 (1957); McCaskill v. Little, 214 Miss. 331, 335, 58 So.2d 801, 802 (1952)). The majority deems this to be a factual issue that cannot be decided on appeal, yet admits that “there is no indication in the record” of any facts that might *1225 give the youth court jurisdiction. With a jurisdictional basis glaringly absent from the record, this Court has the duty to resolve this basic, threshold question.
¶ 31. With no constitutional or statutory grant of jurisdiction, the youth court possessed no authority to order E.K. to submit to a CAC interview. Therefore, the order was void, and the mother could not be held in contempt for failing to comply. Tinnon, 716 So.2d at 610 (“[Wjhere an order is void the violation of such an order is excusable.”).

Contempt

¶ 32. Assuming arguendo that the youth court did have jurisdiction, I would still dissent because this is clearly a case of constructive criminal contempt.
¶ 33. “In civil contempt cases, the con-temnor can discharge the contempt by paying the costs and expenses and doing what he had previously refused to do. In other words, he carries the keys of his prison in his own pocket.” Common Cause of Miss. v. Smith, 548 So.2d 412, 415 (Miss.1989). By contrast, an order of contempt is criminal in nature “where the sentence of imprisonment is ‘for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense.’ ” Id. at 416 (quoting Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 633, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988)). Criminal contempt “is proper only when the contemnor has wilfully, deliberately and contumaciously ignored the court, or the court’s directive.” In re Smith, 926 So.2d 878, 887-88 (Miss. 2006) (citing Premeaux v. Smith, 569 So.2d 681, 684 (Miss.1990)).
¶ 34. The contempt order says that the mother “admitted to interfering with the interview by the [CAC] and an investigation by [DHS],” that is, she “willfully, deliberately and contumaciously ignored the court.” In re Smith, 926 So.2d at 887-88. By the order’s own words, it is clear that she was being punished for past conduct, punishable, if at all, as criminal contempt of court.
¶ 35. Yet, the majority concludes that this was a case of civil contempt because the purpose of the mother’s incarceration was “to further DHS’s investigation and enforce compliance with the court’s order for the son to undergo the CAC interview.” Maj. Op. at 1220. Given that the confinement was for a definite period of time, forty-eight hours, the intent could only have been to punish the mother for refusing to have her son submit to the interview. The majority also concludes that “we cannot assume that placing the son in DHS’s custody would assure no contact.” Maj. Op. at 1221. Had the trial judge truly believed that removing custody from the mother was not sufficient to ensure that she would not interfere, then he would have placed the mother in custody until the investigation was complete, not for a finite period of time. That was not the case. The mother did not possess “the keys” to her cell. Common Cause, 548 So.2d at 415. Instead, she was forced to remain in jail until her sentence had been fully served.
¶ 36. The majority also assumes that the forty-eight-hour time limit on her incarceration was based on the social worker’s testimony that the interview would occur within the next two days. Maj. Op. at 1221. Yet, according to the youth court prosecutor’s brief, the reason for the forty-eight-hour time limit was to avoid the need for an initial appearance as required under Uniform Circuit and County Court Rule 6.03. Again, the time limitation on the mother’s incarceration was not in any way related to enforcing compliance with a court order; the confinement was plainly punishment.
*1226 ¶ 37. As punishment for conduct committed outside the courtroom, this was a case of constructive criminal contempt, and the mother was entitled to procedural due process safeguards. In re Smith, 926 So.2d at 888 (quoting In re Williamson, 838 So.2d 226 (Miss.2002)). Because she was not afforded notice of the proceedings or of the charges against her, the youth court deprived the mother of liberty without due process of law, in violation of both the Fourteenth Amendment to the United States Constitution and Article 3, Section 14, of the Mississippi Constitution.

Fifth Amendment Implications

¶ 38. Finally, I must note that I am deeply disturbed by the entire process, and what appears to be a flagrant disregard for fundamental constitutional rights of the accused child. It is basic to our system of justice that no one shall be “compelled in any criminal case to be a witness against himself,” and that “the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.” Miranda v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See also Miss. Const, art. 3 § 26 (“the accused ... shall not be compelled to give evidence against himself’)- As a suspect in a criminal investigation of E.K. himself, that was so factually intertwined with his own alleged victimization, the court-ordered “interview” plainly implicated E.K.’s Fifth Amendment right against self-incrimination.
¶ 39. Although this issue was not raised by the parties, it was discussed at length during oral arguments before this Court. The prosecutor for the youth court was adamant that the purpose of the interview was to investigate the allegations that E.K. had been sexually abused, and that the interviewer would not question E.K. about the charges against him. However, it appears that this interview was nothing more than a subterfuge that sought to acquire a confession or other incriminating statements from the child that he had abused another child.
¶ 40. It is apparent from the transcript that one of the investigating authorities believed E.K. had been abused. However, the judge, the prosecutor, the social worker, and the guardian ad litem all expressed their belief that the mother had encouraged her son to fabricate the abuse allegations in an attempt to deflect the charges against him. Most telling are the comments made by the guardian ad litem, a person charged with protecting E.K’s interests, but who proved to be far from an advocate for the child:
I find it quite ironic, ma’am, that at 11:23 or 11:24, whatever the time was, there was a call made to DHS saying that your child was an alleged perpetrator, and then seven or eight minutes later there’s a call to DHS saying that your child is an alleged victim. I find that quite ironic, don’t you?
I clearly believe that you would bring up this whole story for your own personal benefit.... I’m tired of coming here everyday, six and seven hearings, for sexual abuse. There’s no excuse for that, and to have a mother here frustrating this process and pimping this Court. I’m not going to stand for that.
¶ 41. It is also unrealistic to maintain that an interview would not have dealt with both sets of allegations. The two charges are so closely related, temporally and factually, that they would necessarily overlap. Indeed, the mother testified that when she took E.K. to be interviewed, she overheard two social workers and a law enforcement official talking to the therapist who was to conduct the interview. *1227 The mother testified that “they were telling the therapist ... that E.K. was lying, that E.K. had made up the story.”
¶ 42. And, despite assertions to the contrary at oral argument, the prosecutor’s brief suggests rather strongly that the interview would go beyond the scope of E.K.’s abuse. The brief repeatedly references the rights of “Baby Jane Doe,” the child that E.K. was alleged to have abused, and states “Baby Jane Doe also has a due process right that DHS follows in its policies and practices, which includes interviewing her alleged perpetrator.”[2]
¶ 43. Under the circumstances of this case, I cannot ignore the inherent Fifth Amendment implications associated with compelling E.K., a criminal suspect, to submit to a court-ordered interview, without his mother’s consent and without the benefit of counsel.
GRAVES, P.J. AND CHANDLER, J., JOIN THIS OPINION. PIERCE, J., JOINS THIS OPINION IN PART.

. Of course, the youth court would have had jurisdiction over the allegations that E.K. was sexually abusing another child. Miss.Code Ann. § 43-21-151(1).

. To support the argument that DHS had some duty to interview the child's abuser, the appellee cites Mississippi Department of Human Services v. S.W., 974 So.2d 253 (Miss. App.2007). In S.W., a child sued DHS after he was allegedly abused sexually by employees of the child care facilities in which he was placed. That case is easily distinguishable as it involved a child in DHS custody suffering abuse at the hands of his caretakers. In the present case, neither E.K. nor "Baby Jane Doe” was in DHS custody, and neither allegation of abuse was directed at a parent, guardian, or caretaker.