RUSSELL, J.,
dissenting:
¶ 27. The majority affirms the chancellor’s judgment of criminal contempt against Greg because he was “not forthcoming with information regarding the status” of E. Jane’s heirlooms. The majority further found, as did the chancellor, that criminal contempt was proven beyond a reasonable doubt. In my view, the chancellor abused his discretion in holding Greg in criminal contempt, ordering him incarcerated for thirty days, and requiring him to pay the replacement value of the heirlooms. Therefore, I would reverse the judgment of contempt.
¶ 28. We review cases of criminal contempt ab initio. In re Smith, 926 So.2d 878, 885 (¶ 9) (Miss.2006). This Court proceeds ab initio to “determine whether the record proves the appellant guilty of contempt beyond a reasonable doubt.” Dennis v. Dennis, 824 So.2d 604, 608 (¶ 7) (Miss.2002).
¶ 29. “A citation of contempt is proper when ‘the contemnor has willfully and deliberately ignored the order or the court.’ ” Westerburg v. Westerburg, 853 So.2d 826, 828 (¶ 6) (Miss.Ct.App.2003) (quoting Bredemeier v. Jackson, 689 So.2d 770, 777 *31 (Miss.1997)) (emphasis added). Our supreme court has explained the difference between civil contempt and criminal contempt as follows:
If the purpose of the proceedings is to coerce action or non-action by a party, the order of contempt is characterized as civil. This type [of] contempt proceeding is ordinarily instituted by one of the parties to the litigation who seeks to coerce another party to perform or cease performing an act. The order of contempt is entered by the court for the private benefit of the offended party. Such orders, although imposing a jail sentence, classically provide for termination of the contemnor’s sentence upon purging himself of contempt. The sentence is usually indefinite and not for [a] fixed term. Consequently, it is said that the contemnor “carries the key to his cell in his own pocket.” On the other hand, a criminal contempt proceeding is maintained solely and simply to vindicate the authority of the court or to punish otherwise for conduct offensive to the public in violation of an order of the court.
Moulds v. Bradley, 791 So.2d 220, 224 (¶ 6) (Miss.2001) (quoting Newell v. Hinton, 556 So.2d 1037, 1044 (Miss.1990)). In other words, “[i]f the primary purpose is to enforce the rights of private party litigants or to enforce compliance with a court order, the contempt is civil.” Purvis v. Purvis, 657 So.2d 794, 796 (Miss.1994). In cases of civil contempt, “[o]ne may be jailed or fined for civil contempt, however, the contemnor must be relieved of the penalty when he performs the required act.” Id. at 796-97. In contrast, “[c]rimi-nal contempt penalties are designed to punish for past offenses and they do not end when the contemnor has complied with the court order.” Id. at 797. Constructive criminal contempt “involves actions which are committed outside the presence of the court.” Moulds, 791 So.2d at 225 (¶ 8).
¶ 30. In Scroggins v. Riley, 758 So.2d 467, 472 (¶ 20) (Miss.Ct.App.2000), a divorced wife sought to have her former husband held in contempt for failing to provide certain items of personal property, but the chancellor declined to do so. The chancellor noted that the “form of the contempt sought by [the former wife was] criminal in nature since she [sought] to punish [her former husband] for either negligently permitting or willfully causing her property to be damaged while in his safekeeping.” Id. at 473 (¶ 23). However, the former wife “failed to present any evidence that [he] wilfully damaged her property, nor was there sufficient evidence that he negligently permitted her property to suffer damage while it was in his control after the judgment of divorce.” Id. Because there was “no evidence of any negligence or want of care on [his] part in the time after entry of the divorce judgment[,]” a finding of contempt would have been improper. Id. Therefore, this Court affirmed the chancellor’s denial of contempt. Id.
¶ 31. In the instant case, there was reasonable doubt as to whether Greg’s actions were willful and deliberate as required to be held in contempt. See id; see also Westerburg, 853 So.2d at 828 (¶ 6). The record reflects that Greg suffered three strokes in the year immediately preceding the divorce. The chancellor noted this fact in the judgment of divorce:
As a preliminary matter, the court notes that Greg suffered a stroke in June, 2005. Since that date, he has remained totally disabled up through the date of trial. At trial, counsel for Greg examined him as to his ability to act on his own behalf without the appointment of a conservator. There was no medical testimony that Greg was incapable of act *32 ing on his own behalf. As Exhibit 6, a weekly income benefits claim form from Grey’s employer was introduced, which showed a diagnosis of a cerebral vascular accident with right weakness occurring on or about June 16, 2005, releasing him to partial duties on August 17, 2005. Those records further note that this was his third CVA in the past year. He demonstrated “mild confusion” on his functional capacity assessment. The assessment noted speech difficulty which was being treated elsewhere. There was no additional medical proof. Based upon the demonstrated ability to respond to questions, the court allowed the matter to continue. The court notes that Greg is not reliable in his testimony. His memory is faulty. Regarding his 8.05, he was hopelessly confused as to numbers and amounts. At best, he was not deceptive, but he was not reliable. Needless to say, the court, having observed his demeanor, is of the opinion that he is not trustworthy.
(Emphasis added). At the divorce hearing, Greg testified how the strokes have adversely affected his memory, his ability to put thoughts into words, his ability to write, his ability to walk, and his ability to explain himself. He was also forced to retire from truck driving due to his stroke, and he was receiving — and continues to receive — disability income. At the subsequent contempt hearing, it was evident that Greg was still having problems explaining himself. The chancellor even stopped Greg’s testimony and stated he was “concerned about whether or not we need to have a conservator set up [for Greg] and proceed from that point[,]” but the chancellor allowed Greg to continue. In my view, the chancellor abused his discretion in holding Greg in criminal contempt because Greg was clearly suffering from several problems due to the three strokes he suffered in the year immediately preceding the parties’ divorce.
¶ 32. Furthermore, Greg also had a valid defense of impossibility. “Impossibility of performance of a court directive due to circumstances beyond the control of the alleged contemnor is a perfect defense to a contempt citation.” Ewing v. Ewing, 749 So.2d 223, 225 (¶ 7) (Miss.Ct.App.1999). In Ewing, the husband was awarded two jet skis, which the wife failed to turn over to the husband. Id. at 223-24 (¶¶ 2-3). The wife alleged that the jet skis were stolen, and as such, she was unable to comply with the provisions of the judgment of divorce. Id. at 224 (¶ 3). Nevertheless, the chancellor held the wife in contempt, and wife appealed. Id. at 223 (¶ 1). On appeal, this Court reversed the judgment of contempt, finding that the chancellor was not free to simply disregard the wife’s evidence that the skis were stolen from her because if “the skis were actually stolen, then [the wife] simply cannot be in contempt for her failure to accomplish an- act that was impossible to perform for reasons beyond her control.” Id. at 225 (¶ 8).
¶ 33. Likewise, in the case before us, Greg repeatedly testified that he did not know where the items were, that they were destroyed by Katrina, or that he simply did not have the items. Greg testified at the divorce hearing as follows:
Q: Now, the heirlooms that’s in your home that came from the Walker family, do you want her to have them?
[[Image here]]
A: Yes.
[[Image here]]
Q: You have no objection to her picking them up whenever it’s convenient for her and yourself?
A: Yeah.
*33 Q: Without any interference from you?
A: I can’t get in the attic.
Q: I’m sorry?
A: I can’t get in the attic. If she’s got anything up there, I can’t get to it.
(Emphasis added). Thus, Greg never testified that he was in possession of the heirlooms. He merely stated that “if’ the heirlooms were in the attic, he could not get to them. At the subsequent contempt hearing, Greg testified that he did not have E. Jane’s property:
Q: Okay. Let me ask you this. What, if anything, was left of Ejane’s list in your home after the hurricane?
A: Nothing.
[[Image here]]
Q: Are you hiding any property of your wife’s?
A: No, sir.
Q: Okay. Are you intentionally telling this court anything that’s not true?
A: No.
Additionally, the parties’ son, Eric, testified that the entire roof was damaged from Katrina, and that nothing was in the attic when he helped his father with repairs shortly after the storm. Thus, if heirlooms were actually destroyed or lost in Katrina, then Greg cannot be in contempt for his failure to accomplish an act that was impossible to perform for reasons beyond his control. See id. Further, if the items were destroyed by Katrina as stated by Greg and Eric, Greg’s actions could not have been deliberate or willful. See Westerburg, 853 So.2d at 828 (¶ 6).
¶ 34. Finally, I note that the daughter, who did not get along with her father, testified she saw E. Jane’s property in the attic in the summer of 2007, over a year after the parties were divorced on February 15, 2006 and after the 2005 roof damage by Katrina. E. Jane testified that she personally had been over to Greg’s house post-Katrina approximately twenty (20) different times to do laundry, yet she admitted she never took the heirloom property. It is troublesome that she waited until September of 2007, a year and a half following the divorce, to file a complaint for contempt concerning the heirlooms. E. Jane provided no explanation why she did not retrieve her heirloom on her many visits to the house or why she waited so long to file for contempt.
¶ 35. In summary, I find that the criminal contempt was not proven beyond a reasonable doubt. In my view, because Greg’s actions did not rise to the level of deliberate or willful, I find that the chancellor abused his discretion in holding Greg in criminal contempt. Therefore, I would reverse the judgment of criminal contempt against Greg.
IRVING, P.J., JOINS THIS OPINION.