# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01385-COA

IN THE MATTER OF THE                                           **APPELLANT**
CONSERVATORSHIP OF PATSY B. BENNETT:
BOB BENNETT, JR.

v.

JOSEPH BOWEN BENNETT, GUARDIAN AND                **APPELLEE**
CONSERVATOR OF PATSY BOWEN BENNETT

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/2023 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MEGAN STUARD THORNTON |
| ATTORNEY FOR APPELLEE: | KEITH CURTIS KANTACK |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/05/2025 |
| MOTION FOR REHEARING FILED: | |

**BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Bob Bennett Jr. ("Bobby") appeals from the Lee County Chancery Court's order finding him in criminal contempt for violating orders prohibiting him from visiting his mother (Patsy Bennett) in an elderly care facility in Biloxi and for distributing mass mailings about his mother and the court proceedings concerning her. The Lee County Chancery Court imposed a $200 fine on Bobby, ordered him jailed for sixty days for these violations, and ordered him to pay the guardian ad litem's fee of $2,850. Bobby appeals. He argues that the proof was insufficient to support a finding of criminal contempt and that his rights to due process, to free speech, and to have an attorney present at the hearing on the contempt matter

were violated when the court denied his motion for a continuance. Having reviewed the record and arguments of counsel, we affirm the chancery court's judgment.

## Facts and Procedural History

¶2.     In 2019, Patsy, the mother of three adult children, Bobby, Joseph D. Bennett ("Jody"), and Desha Bennett Cruse, was living in Tupelo.[1] After his divorce in Texas that same year, Bobby moved back to Mississippi, rented an apartment in Oxford, and visited Patsy several days a week before he ultimately moved in with her.[2] Prior to that time, in 2017, Patsy had given Jody, who lived in Gulfport, a power of attorney and made him the executor of her will. There is no dispute that Patsy was experiencing symptoms of dementia, and in January 2019, she was diagnosed with Alzheimer's. The family started planning for Patsy to eventually move to an assisted living facility. Patsy visited some facilities, both with Bobby and Jody, and was aware of the plan.

¶3.     In October 2021, Bobby sent Jody a text message that it was time for Patsy to move to the facility. An incident also had occurred where a man came to Patsy's house soliciting yard work. When the man returned to be paid, Patsy, who had some pre-signed checks, was physically unable to write the check out to him, so the man took several checks out of her checkbook and left. Patsy then called Jody hysterically and told him about the incident. Jody came to Tupelo, went to the bank, and learned that two of the checks already had been cashed.

---

[1] Desha lived in Pontotoc and was her husband's caregiver.

[2] At some point (it is unclear when), Bobby moved into Patsy's home.

*Petition for Guardianship and Conservatorship*

¶4.    After that incident, Jody took Patsy to Biloxi, and on October 27, 2021, he filed a petition in the Harrison County Chancery Court to be appointed Patsy's guardian and conservator. Jody attached certificates of two physicians verifying Patsy's Alzheimer's diagnosis and condition. Desha waived service of process and joined in Jody's petition; Bobby was unaware of the filing. Jody was appointed as her guardian and conservator by a court order signed by Harrison County Chancellor Carter Bise on November 12, 2021. Jody moved Patsy into an assisted living facility in Biloxi called The Blake.

¶5.    On January 24, 2022, Bobby filed a petition to intervene in the guardianship and a motion to dismiss the conservatorship or remove the conservator. At a hearing on February 17, 2022, Bobby did not contest Patsy's dementia or that she was at a point where she needed some care, but he objected to Patsy's placement in Biloxi rather than Tupelo. However, even Patsy's sister, Nina Cantrell, testified that it was better for Patsy to live on the Mississippi Gulf Coast where Jody, her guardian and conservator, lived. Moreover, the facility there had a memory care center as well. The chancery court allowed Bobby to intervene, and the case was transferred to the Lee County Chancery Court and assigned to Chancellor Stephen T. Bailey. On April 21, 2022, Bobby filed an amended motion to dismiss the conservatorship and motion for contempt. On May 13, 2022, the court appointed Attorney Amanda Daniels as Patsy's guardian ad litem (GAL). Jody was never removed as guardian or conservator.

*Ensuing Petitions and Orders*

*(1) Visitation*

3

¶6.     Over the following months, Chancellor Bailey issued numerous orders,[3] including one on October 24, 2022, which, among other things, suspended Bobby's visitation with Patsy until further order of the court and authorized the facility, The Blake, to deny Bobby access to Patsy. The order was the result of a hearing held on October 18, 2022, on a motion filed by the GAL in which she sought to have Jody remove a hidden camera he had placed in Patsy's room and to suspend Bobby's visitation.[4] Jody had placed a hidden camera in Patsy's room to ensure that Patsy's bedding was being changed and to protect her from any abuse by the facility's personnel. However, this camera recorded Bobby encouraging Patsy to be uncooperative with the staff and to throw and break items. Bobby could be heard coaching Patsy to tell the court that she wanted to live in Tupelo, as if rehearsing her to testify in court. The court viewed these videos and noted that Patsy became agitated during these conversations with Bobby and, at times, seemed confused. The court found that Bobby had "made aggressive statements to the Ward regarding this litigation, Jody, himself [(Bobby)], and the legal system itself."

¶7.     The court had previously found Patsy was a vulnerable adult as defined in Mississippi

---

[3] The docket contains twenty-nine pages of filings and proceedings. Although they reflect the contentious nature of the parties and the issues, most are not relevant to the appeal before us.

[4] The GAL filed the motion on September 26, 2022, to which Bobby responded. On October 4, 2022, the court set the motion for a hearing on October 18, 2022. However, on that day, Bobby's attorney filed a motion for a continuance, asserting that Bobby was out of the country on vacation. Given the nature of the issues and the fact that the court had given the matter a priority setting, the court denied the motion for a continuance.

Code Annotated section 43-47-5(q) (Rev. 2023).[5]  The court specifically stated:

> The Court would note that any further conduct on the part of Dr. Bennett in attempting to coach, influence, or persuade Mrs. Bennett as to her behavior or responses relevant to this proceeding in a manner which may be deemed to result in mental or emotional distress for Mrs. Bennett may warrant further investigation pursuant to Mississippi Code Annotated Section 43-43-19, which criminalizes the willful infliction of mental anguish on a vulnerable person.

The court found that it would be in Patsy's best interest that Bobby's visitation be suspended until further order of the court.  However, because Bobby was not present, the court afforded him the right to bring the matter before the Court again on proper motion and notice thereof to explain his behavior as depicted in the videos viewed by the court and to show the court why visitation should be reinstated.

¶8.     Concerning the camera installed by Jody, the court noted the privacy concerns raised by the GAL and that Mississippi does not have any current legal precedent governing the placement of in-room camera installations in care facilities.  However, the court stated that Bobby's behavior would not have been made known to the court but for the camera being present.  Therefore, the court found that Patsy's best interest, well-being, and protection outweighed the privacy interests of visitors who may enter her room, and allowed the camera to remain in Patsy's room on a temporary basis.

### (2) Mass Mailings

---

[5] "Vulnerable person" means a person, whether a minor or adult, whose ability to perform the normal activities of daily living or to provide for his or her own care or protection from abuse, neglect, exploitation or improper sexual contact is impaired due to a mental, emotional, physical or developmental disability or dysfunction, or brain damage or the infirmities of aging.  Miss. Code Ann. § 43-47-5(9).  The term "vulnerable person" also includes all residents or patients, regardless of age, in a care facility.  *Id*.

¶9. On December 8, 2022, Jody filed an emergency motion to report a mass mailing that Bobby had circulated and a YouTube video he had posted concerning Patsy and the case. On December 12, 2022, Bobby filed a motion for a continuance, and Bobby's attorney filed a motion to withdraw. In an order issued on December 13, 2022, the court noted the presence of Bobby's counsel[6] and denied the motion for continuance given the emergency nature of the situation. The court further denied counsel's motion to withdraw without prejudice because proper notice had not been given to Bobby. The court continued in its order that it had viewed the videos of Patsy and found her to be a vulnerable person with impaired abilities to provide for her own care. The video showed Bobby yelling at Patsy, berating her, and speaking to her in a demeaning fashion. The court stated that Bobby had shown Patsy an iPad with videos and pictures of the family "in a sickening attempt to inflict mental anguish on Mrs. Bennett in furtherance of his own initiatives." The court found that Bobby had circulated 6,800 copies of a mailout that began:

REMOVE JUDGE CARTER BISE

Patsy Bennett was

ABDUCTED FROM TUPELO, MS IN 2021

HELD AGAINST HER WILL IN BILOXI, MS

by SECRET FRAUDULENT COURT ORDER

---

[6] Bobby did not appear, and the court noted that Bobby had been out of the country for both the October and December 2022 hearings. The court stated that it had suspended Bobby's visitation "until such time as he personally appeared before the Court for said issue to be addressed. Dr. Bennett has yet to take the opportunity to appear before the court and explain himself."

The court addressed the inaccuracies of the mailout and found that Bobby's behavior was "a blatant attempt by abuse to intimidate the Court in the discharge of its official duties as chancellor in upholding the law and protecting the best interest of Mrs. Bennett, the Court's Ward and a vulnerable person under a disability." The court noted that much of Bobby's conduct was criminal in nature and determined that a gag order would not violate Bobby's First Amendment rights. The court stated:

> The Court finds that less extreme measures are not available to the Court, and even if they were, they would not be effective. Dr. Bennett has been previously warned by this Court about his behavior and his maltreatment of his mother as a vulnerable adult, but instead of ceasing such, he has now boldly escalated his egregious course of conduct.

The court ordered Bobby not to speak publicly or communicate the facts of the case that refer to Patsy by name or any other family member by name, through print or broadcast media, and to remove all information from public access within twenty-four hours. However, because there was no prior order in place that Bobby had violated, the court denied the request that Bobby be held in contempt.

*Recusal Attempts*

¶10.    Between January and October 2023, Bobby sought to have Chancellor Bailey removed from the case. On May 23, 2023, Chancellor Bailey denied Bobby's pro se motion for recusal. Bobby then filed actions in other courts seeking to have Chancellor Bailey removed. On April 4, 2023, Bobby filed a "Motion for Immediate  Relief" with the Mississippi Supreme Court, requesting that the Court require Chancellor Bailey to recuse himself. While that matter was pending, on April 27, 2023, Bobby filed an action against Chancellor Bailey

7

personally in the United States District Court for the Northern District of Mississippi, seeking a temporary restraining order against the chancellor. On June 5, 2023, the Supreme Court denied Bobby's motion, and the federal court later dismissed Bobby's federal action on October 30, 2023.[7]

¶11. On June 6, 2023, Chancellor Bailey held Bobby in contempt for Bobby's conduct during a hearing on several motions that had been filed in the case. According to the court's order, Bobby refused to answer questions, and instead, gave long non-responsive diatribes. Despite the court's admonitions, Bobby insulted counsel and generally disrupted the proceedings. Bobby was sanctioned and sentenced to twenty-four hours of incarceration, which the court suspended pending Bobby's compliance with all orders in the future. The court also ordered Bobby to pay a $100 fine.

*September 28, 2023 Visit*

¶12. On September 28, 2023, Bobby drove Libby Oswalt, Patsy's alleged friend and former co-worker, to Biloxi for Oswalt to visit her. When they arrived at The Blake, Patsy was sitting outside and approached the car. Bobby stayed inside the vehicle, but he did converse with Patsy. Bobby left Oswalt to visit with Patsy and returned after lunch to pick Oswalt up. At that time, Bobby gave Patsy some family pictures, which he told her to hide, and a shawl. He also videotaped and took pictures of her. As they tried to leave, Patsy cried and gripped the car door. Oswalt allegedly had to pry Patsy's fingers off so they could leave.

¶13. Bobby prepared an affidavit for Oswalt to sign, which he filed in his federal court case

_____

[7] On August 1, 2023, Bobby again moved the chancellor to recuse himself. Jody responded to the motion, and Chancellor Bailey denied it on August 30, 2023.

prior to that action's dismissal. In the affidavit, Oswalt said that she told Patsy that the judge had kept Bobby from visiting her, which upset Patsy. Oswalt said that Patsy told her that Jody and Desha never visited her and that she knew they were the ones who tricked and abducted her to Biloxi to get control of her money. Oswalt also said she was at the "Welcome Home" party in Tupelo that Bobby had brought Patsy to and described how Jody, Desha, and the GAL had stopped it because they told law enforcement that Bobby had abducted Patsy. Oswalt said that Patsy was begging to come back to Tupelo. Oswalt said she told Patsy that she could not even visit Tupelo: "Jody, the judge and the Ad Litem Amanda Daniels won't let her visit . . . because Patsy would tell her friends what the judge has done to her endangering his job, and that they all want Jody to keep control of her money because he gives the lawyers money and the lawyers know that Jody will do exactly what the lawyers want him to do to protect them from lawsuits against them. Even the District attorney is helping to coverup for these lawyers. . . ."

*Criminal Contempt Motions*

¶14. When Jody and the GAL learned of this visit and Oswalt's affidavit, Jody filed a motion for contempt against Bobby for violating the court's visitation order. In his amended motion for contempt filed on October 21, 2023, Jody alleged that Bobby had visited Patsy on September 28, 2023, despite the court's order barring him. Bobby's attorney was sent a copy of Jody's motion.[8]

¶15. On October 23, 2023, the GAL filed an emergency petition to reopen the court record

_____

[8] Jody's attorney indicated by the certificate of service that all attorneys and the GAL would receive copies via electronic court filing (ECF).

and have Bobby cited for criminal contempt as well. The GAL alleged that on September 28, 2023, Bobby criminally and wilfully violated the visitation order by visiting Patsy at The Blake, making personal contact with Patsy, filming her, and giving her items that he instructed her to hide. In addition, the GAL alleged that Bobby circulated a mass mailout in the Biloxi area with Patsy's name, image, and misleading information on it. It also contained a QR code that directed recipients to a twenty-six-minute video containing defamatory statements about the court proceedings, as well as videos of Patsy, which exploited her as a vulnerable adult. The petition requested that a forensic investigator be appointed to investigate the persons responsible for the mass mailing. In the certificate of service on the petition, the GAL indicated that Bobby's attorney was provided a copy via email.

¶16. Because criminal contempt was sought, and because Bobby had produced a flier that alleged that the chancellor had unlawfully issued orders in the case,[9] Chancellor Bailey transferred the contempt petitions to another chancellor, Hon. Michael Malski, for resolution. In his October 24, 2023 "Order Transferring Limited Issues Within Case and Direction Additional Action" ("Transfer Order"), Chancellor Bailey outlined several issues that Chancellor Malski was to address. Among the issues included were, inter alia, allegations that Bobby had Patsy sign documents (the contents of which were unknown), that Bobby had placed a sign in the yard of Patsy's house in Tupelo, that Bobby was still posting videos of Patsy and the case on YouTube, that Bobby had visited Patsy in September 2023 and filmed

---

[9] Apparently another mass mailing to the public had been prepared, this time referring to the "fraudulent order of Judge Stephen Bailey" and stating that the "JUDGE refuses to RECUSE despite his pending State Commission Complaint."

10

her, and that a new mass mailout had been circulated in Biloxi concerning Patsy and the case. The court directed the GAL to contact the prosecuting authorities for consideration of criminal charges against Bobby. The court set the matter for hearing on November 29, 2023. At the end of his order, Chancellor Bailey certified that he had emailed a copy of the order to Bobby's attorney, the GAL, and counsel for Jody and Desha.

¶17. On October 27, 2023, Bobby was served with a Rule 81 summons for the contempt hearing, *see* M.R.C.P. 81, which was to be held on November 29, 2023, on "all contempt allegations as detailed in the attached Order Transferring Limited Issues Within Case and Directing Additional Action."

¶18. On November 13, 2023, another attorney, Megan Thornton, entered her appearance as counsel for Bobby and filed a motion to continue the hearing.[10] Jody responded on November 15, 2023, and stated that Bobby's new attorney had said in the motion that if the court did not grant the continuance, then Bobby's current attorney, Attorney Doss, would represent Bobby at the hearing. On November 17, 2023, Doss filed a motion to withdraw, saying that Bobby had terminated him, and if he (Doss) was required to attend, then the hearing needed to be continued because he had a deposition scheduled for November 29, 2023.

¶19. On November 27, 2023, Chancellor Malski held a telephone conference with counsel and denied the requests for a continuance and also denied Doss's motion to withdraw.

¶20. On November 28, 2023, Thornton filed a motion to withdraw, and Doss filed a motion

---

[10] The motion was not included in the record, so all bases alleged are not known.

11

to dismiss the contempt matter, alleging that Bobby had not been properly served with the petitions for contempt.

*Hearing on Contempt*

¶21.   On November 29-30, 2023, Chancellor Malski convened the hearing on the petitions for contempt.  Doss appeared on behalf of Bobby and argued the motion to dismiss.  He stated that Bobby had only been served with the order transferring the case for hearing on limited issues, not with the actual contempt petitions.  Jody's attorney and the GAL responded that the Rule 81 summons was issued per the order of Chancellor Bailey, that Bobby's attorneys had received copies of the pleadings when filed, that Bobby had notice and even asked for a continuance, and that Mississippi courts have not required strict compliance with Rule 81.  The chancellor found no merit to the motion to dismiss, noting that Bobby was served with Chancellor Bailey's order that identified the contempt issues and the docket number of the pleading where these allegations are found.  Chancellor Bailey went further in his transfer order to identify the conduct that allegedly violated the court's orders as set forth in the contempt petitions.  Thus, Chancellor Malski found Bobby was afforded adequate due process notice and denied the motion to dismiss.

¶22.   Bobby then addressed the court personally.  He told the court that he had not hired Doss to handle the hearing and that Doss was not prepared for a hearing on all the issues.  Bobby said he had hired another attorney for this hearing, but she could not be there that day.  Bobby said he had a right to be represented by the attorney of his choice and that, if necessary, he would proceed pro se.  However, he made no formal motion for a continuance

12

on the basis of not having an attorney, and during the proceedings that followed, Doss cross-examined witnesses and presented witnesses on Bobby's behalf.

¶23. The court proceeded to hear testimony the GAL presented in support of her motion. The GAL called Libby Oswalt, who testified that on September 28, 2023, Bobby drove her from Tupelo to visit Patsy. She was asked about the affidavit she had signed, and she admitted that Bobby typed it. She said that he had told her that the GAL had lied to the court in saying that Patsy wanted to live in Biloxi. Oswalt admitted that Bobby had told her that a judge had ordered that a camera and microphone be placed in Patsy's room, which she stated in her affidavit, and that it was placed there "to monitor any conversations there that might endanger his [the court's] plan to isolate Patsy in Biloxi the rest of her life while lawyers take her money and home in Tupelo." Oswalt admitted she did not know whether this story was true and that Bobby had told her the conservatorship in Harrison County was fraudulent. Oswalt also testified that she told Patsy that she (Patsy) could not visit Tupelo because the GAL, Jody, and the court would not let her. Again, Oswalt did not know whether this information was true, but Bobby told her it was. Oswalt denied that Patsy came outside after lunch during the September 28 visit although Oswalt had said in her affidavit that Patsy did come outside. Oswalt confirmed that Bobby took a video which was shown to the court. It only lasted five seconds, and on it, Bobby is heard asking Patsy where she wants to live, and Patsy responds, "Tupelo." Oswalt admitted that the visit upset Patsy. Despite this, Oswalt said that just two weeks prior to the hearing, Bobby drove her back down to see Patsy again. This time, they were not able to see Patsy.

13

¶24.   Patrick Kirby, one of Jody's attorneys with an office in Gulfport, also testified.  He told the court that on October 17, 2023, he received a mailout with a photograph of Patsy. The mailout was similar to the one Chancellor Bailey had reviewed in December 2022 urging that Chancellor Carter Bise be removed, that Patsy was abducted from Tupelo, and that she was being held in Biloxi by a fraudulent court order from Chancellor Bise.  The addition of a QR code, though, led to a video that depicted Bobby telling Patsy that she had been kidnapped by Jody and that Jody was attempting to sell her house in Tupelo and spend all her money.  Kirby said others in his neighborhood had received the same mailout and that his cousin in Hancock County received one as well.  Kirby also stated that the video link appears to have been produced after the original mailout, which had been an issue presented to the court in December 2022, implying that the mailout had since been reproduced.  Kirby did not know if Bobby was responsible for the mailout, which states that it was "Paid for by lifelong Tupelo friends/family of Patsy."

¶25.   The GAL attempted to call Bobby as a witness, but the chancellor said he would not require Bobby to testify because the proceeding was of a punitive nature.  Bobby's attorney then moved for dismissal of the GAL's petition under Mississippi Rule of Civil Procedure 41(b).  He pointed out that the September 28 visit was his only visit in a year and that there was no proof that Bobby had intended to visit; rather, he had simply transported Oswalt for her to visit with Patsy.  Nor was there any proof that Bobby was responsible for the mailout. The court denied the motion.

¶26.   Jody then presented his witnesses to support his motion, including Patsy's sister Nina

Cantrall. She testified that she knew Patsy's friends over the years, and the first she heard of Oswalt was three and a half years ago, when Bobby got involved with her. She said Patsy had talked about Oswalt in a negative way, and Cantrall herself had ordered Oswalt out of her sister's house on two occasions. Once, Cantrall and her son had visited Patsy at her home, and Oswalt was there. When Cantrall asked Oswalt who she was, Oswalt identified herself. Cantrall asked her to leave so the family could visit, and when she did, Patsy said that she "could not stand that woman" (Oswalt). The other occasion was when Patsy had the checks stolen by the yard man. Patsy called Cantrall, frantic, and told her what happened. Cantrall went over to Patsy's house, looked at the checkbook, and called Jody. Cantrall told Patsy she was going to go home to get dressed and would be back. When she got back, Oswalt was there. Oswalt said that Bobby had sent her over because he was out of town. Cantrall told her that this was a family matter and asked Oswalt to leave. When she did, Patsy thanked her (Cantrall) for doing so.

¶27. On cross-examination, Cantrall said she had only visited Patsy in Biloxi twice in two years. She said she used to see her every ten days or so when she was in Tupelo and called her every day. She calls her once a week now, but Patsy cannot talk on the phone anymore. Cantrall said that when the phone rings, Patsy does not know how to pick it up. Concerning Oswalt, Cantrall pointed out that Patsy and Oswalt worked in different departments at the bank. Cantrall said she knew the friends that Patsy went to dinner and traveled with. She explained that Oswalt was not Patsy's friend until she got involved with Bobby. Moreover, Cantrall said she knew how Patsy felt about Oswalt.

15

¶28. Jody's attorney next called Charlotte Tune, who lived in Tupelo and who had worked with Patsy at Peoples Bank and Trust a long time ago. Tune never met Bobby, whom she knew was one of Patsy's children. However, Tune said she had received an unsolicited text from Bobby with a five-second video of Patsy attached. Tune said she worked for Gumtree Management, a group that used to collect dues for homeowners at Patsy's housing complex, and Bobby had contacted her about Patsy's dues. Tune said Bobby then sent her this text and video, which upset her because she knew Patsy, but she did not know what was going on.

¶29. The next witness was Laura Curbow, the owner of Barber Printing located in Tupelo, who testified that just before Thanksgiving last year (2022), she created two digital proofs of mailouts for Bobby. She identified the mailings, which were entered into evidence. One mailing referred to Chancellor Bailey and the other referred to Chancellor Bise. Curbow said Bobby gave her the names and information to include in the mailout. She emailed the proofs to Bobby, and Bobby approved both. Curbow produced 10,000 to 12,000 mailings, which were massmailed. Ones regarding Chancellor Bailey were distributed in the Tupelo area; those for Chancellor Bise would have been sent by the post office to the post office in the Biloxi-Gulfport area for distribution. Curbow was shown the more recent mailout regarding Chancellor Bise, which was very similar to the one she produced. Curbow stated that she knew her business did not print the latest one because it did not have her office's postal permit number on it. Also, her office did not print any QR codes on their mailings. So the mailout residents recently received was not printed by Barber Printing. Curbow also testified that Libby Oswalt had picked up the prior mailouts for Bobby. Curbow said that on the

16

advice of the sheriff's department, she sent Bobby an email terminating any business relationship with him in the future.

¶30. At the end of this testimony, Bobby's attorney moved for involuntary dismissal of Jody's contempt petition and renewed his motion to dismiss the GAL's petition under Rule 41(b). He argued that no proof had been presented that Bobby was responsible for the recent mailout, nor was there any proof that Bobby intended to visit his mother when he drove Oswalt down for her visit. Moreover, neither petition had raised the text and video sent to Tune as a basis for the contempt action. The GAL responded that the evidence proved beyond a reasonable doubt that Bobby purposely made contact with his mother on September 28, 2023, in violation of the court's order. In addition, Tune testified that Bobby wilfully forwarded a video of his mother to her unsolicited. The GAL contended that if the court did not find that Bobby was behind the recent mailing, then the court should open a forensic investigation to find out who did because dissemination of such materials is strictly prohibited by the court's orders. The court took Bobby's Rule 41 motion under advisement.

¶31. Bobby's attorney then stated that Bobby had an out-of-state witness, but that it was his understanding that the court did not take testimony by Zoom. The attorney asked to hold the record open until he could bring the witness to court. The GAL and Jody's attorney objected. Bobby's attorney then said that he wanted to call Sheriff Jim Johnson, whom he had not subpoenaed. Due to the lateness of the hour, the court adjourned until the next morning so the sheriff could be found and appear.

¶32. The next day, Bobby's attorney announced that the sheriff was in Memphis.

17

However, Oswalt was present, and Bobby's attorney said Bobby desired to call her. In addition, the attorney told the court that Bobby wished to discharge him, to question the witness pro se, and to have the case reset so he could have present with him his new attorney, Megan Thornton, who was not available for the current hearing. The attorney further stated that Bobby had a vital out-of-state witness, "Mr. Bonin," who could testify that Bobby had no involvement in the recent mailings on the Coast. Bobby then addressed the court personally and said that the sheriff was available to testify the day before, but the other side "took the entire day." Mr. Bonin was also available yesterday to testify by Zoom, but he did not know he could not call witnesses via Zoom. Bobby said he planned to call Jody, the GAL, and the sheriff when he could be available.

¶33. In response, the court noted that Thornton had filed a motion to withdraw as Bobby's attorney, so that basis for a continuance was moot. Next, the court noted that the matter had been set for over thirty days, which was sufficient time for Bobby to get his witnesses to the court. The chancellor pointed out that it was well-known by the attorneys that he did not allow testimony by Zoom. The court also noted that the GAL had told the court the day before that she was not going to be present for the second day of the hearing and that Bobby had said nothing about calling her as a witness. Moreover, it was unnecessary to call Oswalt again, as she had been questioned by all parties twice already. However, he gave Bobby the opportunity for his attorney to question Oswalt if he felt something had been missed. Bobby again raised that he had not hired Doss for this hearing, and after conferring with Bobby, Doss renewed his motion to withdraw. He said that he could not adequately represent Bobby

18

given their difference of opinions on how to proceed. The court denied the motion to withdraw.

¶34. Oswalt testified that she had a close relationship with Patsy. She did recall a time when Cantrall asked her to leave. She said she was visiting Patsy when Cantrall arrived, asking Patsy for her checkbook. They went upstairs, and shortly after, Cantrall came and told Oswalt to leave, saying, "[Y]ou don't know Bob Bennett." Oswalt also testified that she was present at a party that they had for Patsy in Tupelo when law enforcement arrived. Oswalt reiterated that visiting Patsy in September was her own idea. Oswalt also talked about her ministry with Visiting Angels, who sit with residents in care facilities. She said her visit to Patsy was such a visit. On cross-examination, Oswalt admitted that the people at the Tupelo party, the Sullivans, were not Patsy's friends, but, rather, friends of Oswalt and Bobby.

¶35. After completing Oswalt's questioning, Bobby personally addressed the court and said that he wanted to call Jody and the GAL. However, they were not present, and they were not under subpoena. Bobby then moved the chancellor to recuse himself from the case because "it is all too obvious the due process involved in this case has been just a carryover from Judge Bailey," including his inability to have the attorney of his choice present, and the attorney he was "forced to have" did not tell him about having to have his witnesses present. The court denied the motion to recuse and took the matter under advisement.

*Final Judgment*

¶36. On December 13, 2023, the chancellor issued a twenty-seven-page final judgment. The court restated the rulings it made during the trial denying Bobby's motion to dismiss,

19

denying Bobby's motions for Rule 41 involuntary dismissal of the petitions, and denying his motion for the chancellor to recuse. The court further found Bobby guilty of criminal contempt for violating the visitation order when he traveled to Biloxi on September 28, 2023, and spoke with Patsy. The court found that even if Patsy was "serendipitously" outside when he drove up, Bobby did not have to stop and could have parked elsewhere and contacted the facility to have Patsy brought inside before letting Oswalt out. Moreover, the court found that Bobby had violated the order a second time when he picked up Oswalt and again interacted with Patsy.

¶37. Further, the court found that opening a forensic investigation about the mass mailing was unnecessary "because the evidence established beyond a reasonable doubt that Bobby is, at least in part, responsible for the October 2023 mass mailout." The videos that recipients could access through the QR code were taken by Bobby. The only way these videos could be part of the QR code materials is for Bobby to have provided them. Thus, the court found Bobby in violation of the court's prior orders restricting distribution of mass mailings. The court fined Bobby $100 for each court-order violation, for a total of $200, and sentenced him to thirty days in jail for each, for a total of sixty days. The chancellor also required Bobby to pay $2,850 for the GAL services.

*Appeal*

¶38. On December 15, 2023, Bobby appealed. He raises the following issues:

    (1) whether the court erred in denying Bobby's motion to continue;

    (2) whether the evidence was sufficient to support a conviction of criminal

20

contempt; and

(3) whether Bobby's right to free speech protected him from contempt
allegations in publishing the mass mailout.

**Standard of Review**

¶39. If the contempt is criminal in nature, the scope of review is ab initio. *Seals v. Stanton*, 350 So. 3d 1051, 1058 (¶19) (Miss. 2022) (citing *Latham v. Latham*, 261 So. 3d 1110, 1112 (¶19) (Miss. 2019)). More specifically, the court determines ab initio whether the record proves a party guilty of contempt beyond a reasonable doubt. *In re Smith*, 926 So. 2d 878, 886 (¶9) (Miss. 2006). The standard of review for a grant or denial of a motion for a continuance is abuse of discretion, and the appellate court will not reverse the trial court unless the ruling resulted in manifest injustice. *Robinson v. S. Farm Bureau Cas. Co.*, 915 So. 2d 516, 519 (¶9) (Miss. Ct. App. 2005). Finally, "[c]onstitutional issues are reviewed de novo." *Stevenson v. State*, 357 So. 3d 1141, 1148 (¶23) (Miss. Ct. App. 2023).

**Discussion**

I. **Whether the court erred in denying Bobby's motion for a continuance.**

¶40. Bobby was served with notice of the November 29, 2023 hearing on October 27, 2023. Attorney Thornton entered her appearance on November 13, 2023, and filed a motion to continue the hearing as well. Attorney Doss was still Bobby's counsel of record. The court held a telephonic conference with the attorneys on November 27, 2023, and denied the motion to continue. We have no transcript from that telephonic hearing. On appeal, Bobby argues that the court's refusal to continue the hearing denied him his due process right to be

21

represented by counsel.

¶41. "The decision to grant or deny a motion for a continuance is within the discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice." *Zemek v. Gunn*, 394 So. 3d 485, 491-92 (¶23) (Miss. Ct. App. 2024) (citing *Munday v. McLendon*, 287 So. 3d 303, 313 (¶42) (Miss. Ct. App. 2019)). In *Conner v. State*, 875 So. 2d 253, 255 (¶13) (Miss. Ct. App. 2004), we affirmed a circuit court's refusal to grant a continuance even when a defendant had retained new counsel just before trial when the defendant showed no manifest injustice occurred. "The burden of showing manifest injustice is not satisfied by mere conclusory allegations but by concrete facts that show particular prejudice to the defendant." *Berry v. State*, 75 So. 3d 1053, 1059 (¶19) (Miss. Ct. App. 2011).

¶42. Bobby argues that the brief time between the setting of the hearing and the hearing date was sufficient reason to continue the case. He contends that his case is analogous to the defendant's situation in *Cade v. State*, 96 Miss. 434, 50 So. 554 (1909). However, in *Cade*, the defendant was indicted on June 28, 1909, and trial was set for June 30, 1909, a mere two days later. *Id.* at 555. Moreover, the defendant filed an affidavit that he had a witness who was out of the county but only temporarily. *Id*. The trial court denied the request for a continuance, and on appeal, the Mississippi Supreme Court stated:

> [I]f there had elapsed any sufficient length of time between the return of the Indictment and the date of trial for the defendant to have procured this witness, we would not interfere with the court's holding; but the trial was the second day after the indictment was found, thus giving defendant no reasonable time to exert himself to procure this witness.

*Id*. The facts of Bobby's case are clearly distinguishable from those in *Cade*. Here, Bobby had thirty days' notice of the hearing of this matter. We note that contempt actions under Rule 81(d)(2) of the Mississippi Rules of Civil Procedure are even triable on seven days' notice.[11] So Bobby was given ample notice of the proceedings. Although his written motion for a continuance was not included in the record, Jody's response to it indicated that even Bobby's new attorney, Thornton, agreed that Bobby's other attorney of record, Doss, could represent Bobby at the hearing if the continuance was not granted. In fact, Doss did appear at the contempt hearing, argued motions, and questioned witnesses. Bobby was adequately represented by counsel at trial. Thus, we find Bobby has not shown any manifest injustice, and the chancery court did not err in denying his motion for a continuance.

## II. Whether the evidence was sufficient to support a conviction of criminal contempt.

¶43. Contempt, which is conduct that defies the authority or dignity of a court or legislature, interferes with the administration of justice, and is usually punishable by fine or imprisonment. *Macvaugh v. State*, 385 So. 3d 443, 451 (¶17) (Miss. Ct. App. 2023). Mississippi Code Annotated section 9-1-17 (Rev. 2019) specifically provides in part:

> The Supreme, circuit, chancery and county courts and the Court of Appeals shall have power to fine and imprison any person guilty of contempt of the court while sitting, but the fine shall not exceed One Hundred Dollars ($100.00) for each offense, nor shall the imprisonment continue longer than thirty (30) days.

---

[11] Rule 81(d), titled Procedure in Certain Actions and Matters, provides in part:

(2) The following actions and matters shall be triable 7 days after completion of service of process in any manner other than by publication or 30 days after the first publication where process is by publication, to wit: . . . contempt . . . .

"The first question is whether the contempt is civil or criminal in nature, which we determine by looking at the primary purpose of the contempt order." *In re Shamsiddeen*, 358 So. 3d 324, 330 (¶20) (Miss. 2023).

> If the primary purpose is to enforce the rights of private party litigants or to enforce compliance with a court order, the contempt is civil. [*Common Cause of Miss. v. Smith*, 548 So. 2d 412, 415 (Miss. 1989)]. One may be jailed or fined for civil contempt, however, the contemnor must be relieved of the penalty when he performs the required act. *Hinds Cnty. Bd. of Supervisors v. Common Cause of Miss.*, 551 So. 2d 107, 120 (Miss. 1989). Criminal contempt penalties are designed to punish for past offenses and they do not end when the contemnor has complied with the court order. *Smith,* 548 So. 2d at 415-16.
>
> Conduct directed against the court's dignity and authority is criminal contempt. *Lawson v. State*, 573 So. 2d 684, 686 (Miss. 1990). It involves an act "which tends to bring the court into disrepute or disrespect." *Lawson*, 573 So. 2d at 686 (quoting *Cook v. State*, 483 So. 2d 371, 374 (Miss. 1986). Conduct amounting to criminal contempt must be directed against the court or against a judge acting judicially rather than individually. *Culpepper v. State*, 516 So. 2d 485, 486 (Miss. 1987).

*Id*. (quoting *Purvis v. Purvis*, 657 So. 2d 796-97 (Miss. 1994). In *Macvaugh*, this Court noted:

> Civil contempt orders enforce a private party's rights or compel compliance with a court's order. . . . A civil contemnor "carries the keys to his prison in his own pocket" through his ability to comply with the court's orders and end his remedial sanction. Conversely, penalties for criminal contempt are designed to punish the contemnor for disobedience of a court order; punishment is for past offenses and does not terminate upon compliance with the court order.

*Macvaugh*, 385 So. 3d at 451-52 (¶18) (citations and internal quotation marks omitted).

Moreover, "[t]he imposition of punishment for contempt of court is within the discretion of the trial court." *In re Shamsiddeen*, 358 So. 3d at 330 (¶18).

24

¶44.    Here, the record reflects that the purpose of the chancery court's order of contempt was to punish Bobby for violation of specific orders of the court.  The court specifically found, beyond a reasonable doubt, that Bobby was in criminal contempt for "willful, deliberate and contumacious violations of the Visitation Order and the Mass Mailing Order." Thus, the contempt in this case was criminal contempt.

¶45.    After determining the nature of the contempt, the next step is to determine whether the contempt was direct or constructive.  *Id*. at 331 (¶22).

> Direct criminal contempt involves words spoken or actions committed in the presence of the court that are calculated to embarrass or prevent the orderly administration of justice.  Punishment for direct contempt may be meted out instantly by the judge in whose presence the offensive conduct was committed . . . .
>
> Unlike direct contempt, constructive contempt involves actions which are committed outside the presence of the court . . . . In the case of constructive criminal contempt, we have held that defendants must be provided with procedural due process safeguards, including a specification of charges, notice, and a hearing.

*Id*. (citing *In re Williamson*, 838 So. 2d 226, 237 (¶31) (Miss. 2002) (quoting *Moulds v. Bradley*, 791 So. 2d 220, 225 (¶8) (Miss. 2001)).  These safeguards are required because "criminal contempt is a crime in the ordinary sense[,] . . . and criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings."  *Macvaugh*, 385 So. 3d at 452 (¶20) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)).  These protections include the right to "notice . . . and . . . to be informed of the nature and cause of the accusation, of his rights to be heard, to counsel, to call witnesses, to an unbiased judge, to a jury trial, and

25

against self-incrimination, and that he is presumed innocent until proven guilty beyond reasonable doubt." *Macvaugh*, 385 So. 3d at 453 (¶21) (quoting *Dennis v. Dennis*, 824 So. 2d 604, 609 (¶11) (Miss. 2002) (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987))).

¶46.    In addition, the burden of proof in a criminal contempt case is higher than in a civil contempt case. "In a proceeding for criminal contempt, evidence of guilt must be established beyond a reasonable doubt." *In re Smith*, 926 So. 2d at 886 (¶9). The evidence presented may be circumstantial, yet "the law makes no distinction between direct and circumstantial evidence but simply requires that, before convicting a defendant, the jury [or fact-finder] be satisfied of the defendant's guilt beyond a reasonable doubt from *all* the evidence in the case." *Nevels v. State*, 325 So. 3d 627, 634 (¶20) (Miss. 2021). If the judge or jury is convinced from all the evidence that a person is guilty beyond a reasonable doubt, appellate courts can require no more. *Id.*

*Allegedly Biased Chancellor*

¶47.    In the case at hand, Bobby raises several arguments for overturning the chancery court's finding of contempt. First, Bobby contends that Chancellor Bailey was personally biased against him, as shown by language in the transfer order. However, Chancellor Bailey specifically transferred the criminal contempt action to Chancellor Malski to handle to avoid just such an accusation of bias. Chancellor Malski, not Chancellor Bailey, found Bobby in criminal contempt, and Bobby has not shown any malice on the part of Chancellor Malski, who had no prior involvement in the case.

26

*Allegedly Withholding Information*

¶48.　Bobby next contends that the GAL and Jody withheld information related to a criminal investigation that occurred at the same time and resulted in charges against him. Apparently, Bobby is referring to materials contained in the "Appellant's Exhibits Index" he filed, which includes items relating to a criminal indictment in Lee County. However, these materials were not presented to Chancellor Malski during the criminal contempt hearing and are not part of the official record. Appellate courts cannot consider evidence not contained in the record. *Lofton v. State*, 313 So. 3d 528, 532 (¶14) (Miss. Ct. App. 2021); *Rogers v. State*, 318 So. 3d 1192, 1196 (¶15) (Miss. Ct. App. 2021) ("Facts outside the scope of the record before us cannot be considered by us here."). Moreover, these materials were clearly available to Bobby as well, and he could have presented them to the court if he desired.

*Due Process*

¶49.　Bobby next asserts that he did not receive adequate notice of the allegations against him because he was not served with the petitions for criminal contempt, but only served with Chancellor Bailey's order transferring the contempt actions to Chancellor Malski. However, as Chancellor Malski noted in his final judgment, paragraphs 6 and 7 of the transfer order specifically identified the two orders that Bobby had allegedly violated and included the general prohibitions of the orders as well as the docket number of these orders. The transfer order then listed the seven allegations raised in the current petitions against Bobby, summarizing the allegations in separate paragraphs and referencing the docket number of the pleading referred to in the allegation. Bobby takes issue with having to check the docket for

27

the specifics of the orders he allegedly violated. However, he cites no authority that required the GAL or Jody to serve him with the underlying contempt petitions.

¶50.    The husband in *Dennis v. Dennis*, 824 So. 2d 604, 609-10 (¶13) (Miss. 2002), was not served with a Rule 81 summons at all, and the Mississippi Supreme Court found no error. But here Bobby received not only the summons but also the transferring order, which included the specific charges against him. Moreover, in finding that the husband in *Dennis* had waived his claim of lack of notice, the Supreme Court noted that the husband's attorney had been served with the motion two weeks before the hearing and that the husband aggressively defended himself at the hearing. *Id*. at 610 (¶16). Similarly here, both the GAL and Jody's attorney certified that they sent Bobby's attorney copies of the motions for contempt when they were filed. In addition, in a "Notice of Entry of Judgment or Order" dated October 24, 2023, Chancellor Bailey gave notice to all counsel, including Bobby's attorney, of the entry of the transfer order, with a copy attached. So Bobby's attorney had both the contempt petitions and the transfer order weeks before the hearing.

¶51.    The procedural due process safeguards afforded to a defendant in constructive criminal contempt proceedings include an impartial judge, specification of charges, notice, and a hearing. *In re McDonald*, 98 So. 3d 1040, 1044 (¶10) (Miss. 2012). The Mississippi Supreme Court has held that the "notice" means the Rule 81 summons notice of the date and time of the hearing, and that the specification of the charges required can be satisfied by another document. In *McDonald*, the chancery court issued show-cause orders to defendants who had falsified service of process returns, instructing them to "be prepared to present

28

evidence as to why they should not be found in contempt of court and sanctions, including incarceration and/or a fine, should be entered accordingly [due] to the failure to properly serve process, filing improper affidavits and/or notarizing improper affidavits." *Id*. at 1044-45 (¶10). The Mississippi Supreme Court found that these show case orders gave defendants notice of the contempt charges against them. *Id*. Separate from this notice, however, these individuals were also entitled to summonses issued pursuant to Rule 81(d). *Id*. at 1045 (¶11). Similarly, in *C.W. v. Lamar County*, 250 So. 3d 1248, 1257 (¶33) (Miss. 2018), a special master issued show-cause orders to the director of the state mental hospital to explain why she was overriding courts' commitment orders.[12] *Id*. On appeal of the contempt findings, the Supreme Court held that "the special master did provide some notice to [the director] of the nature of the alleged contumacious conduct and charges through the orders to show cause. And the special master held a hearing." *Id.* However, again, because no Rule 81 summons was issued, the Court found the criminal contempt proceedings to be procedurally defective. *Id*. at 1258 (¶37).

¶52.    In the case at hand, Bobby was entitled to an impartial judge, which was satisfied when Chancellor Bailey recused himself and appointed Chancellor Malski to hear the contempt matters. Bobby was entitled to be provided the specific charges against him, which he was when he was served with the transfer order that detailed the charges and referenced the docket numbers of the pleadings and the substance of the issues. He may not have been

---

[12] The show-cause orders directed the director of South Mississippi State Hospital to show cause why she should not be held in contempt of court for her refusal to abide by the orders of commitment. *Id*. at 1251 (¶5).

29

served with the actual petitions, but just like the show-cause orders in the cases listed above, the transfer order he was served detailed the specific charges contained in those petitions. Bobby was also entitled and does not dispute that he received a Rule 81(d) summons giving him the date, time, and place of the hearing. Service of the Rule 81(d) summons along with the transfer order gave the court jurisdiction over Bobby.[13] Finally, Bobby was entitled to and afforded a hearing on the charges. Accordingly, we find no merit to Bobby's due process claim for lack of notice.

*Insufficient Proof*

¶53. Bobby next argues that the proof was insufficient to support a finding of criminal contempt. However, the record clearly supports the chancery court's findings that Bobby had knowingly, willfully, and contumaciously violated the court's prior orders concerning Bobby's visitation with Patsy and distribution of mass mailings. Concerning the visitation order, the chancery court correctly noted the undisputed facts that Bobby intentionally drove Oswalt to the facility on September 28, 2023, and interacted with Patsy on that visit. Bobby gave Patsy photographs and a shawl and told her to hide these items, or Jody would take them from her. As the chancery court noted, there was no need for Bobby to see or interact with his mother, as he could have waited to drop Oswalt off until after his mother went inside. Yet Bobby not only interacted with Patsy, he photographed and videotaped her,

---

[13] Normally, a party preparing a Rule 81 summons would attach the petition or motion for contempt. However, in this case, although Bobby was not served with the underlying petitions, the service of the transfer order, which detailed the charges against him, rectified any deficiency in the service of process and conferred jurisdiction on the court in this contempt matter.

pressing her about where she wanted to live and clearly upsetting her.

¶54. Concerning the mass-mailing order, the record also supports the chancery court's finding that Bobby had violated previous orders of the court. Although Bobby had argued that there was no direct proof that he was responsible for the latest mass mailing, the circumstantial evidence pointed to his involvement. As the court noted, only he had the video of his mother saying she wanted to live in Tupelo. Moreover, the printer of the first mass mailing testified that the recent mailing was exactly the same as the one she had prepared, except for the addition of the QR code to link to the video. Although the printer stated that she had not prepared the recent mass mailing, she said that she had emailed Bobby the draft of the mailing of the first one for his approval. Therefore, Bobby had the mass-mailing format in his possession. Because that same format was used along with Bobby's video to create the October 2023 mailing, there is ample evidence to support the chancery court's finding beyond a reasonable doubt that Bobby had wilfully violated the mass-mailing court order.

¶55. Accordingly, we find no error by the chancery court in its findings that Bobby had wilfully, deliberately, and contumaciously violated both the visitation and mass-mailing order of the court.

### III. Whether Bobby's right to free speech protected him from contempt allegations in publishing the mass mailout.

¶56. Although Bobby claimed at trial that he had nothing to do with the October 2023 mass mailing, he now argues on appeal that his First Amendment right to free speech protected him from contempt if he did. However, Bobby failed to raise this argument to the trial court

31

below during the contempt hearing, so he is procedurally barred from raising it on appeal. *Stratton v. McKey*, 384 So. 3d 499, 503 (¶13) (Miss. 2024) ("The Court does not consider arguments raised for the first time on appeal."); *Smith v. State*, 385 So. 3d 879, 883 (¶10) (Miss. Ct. App. 2024) ("New arguments are considered new issues that can be procedurally barred if not presented to the trial court.").

¶57. Bobby's free speech argument essentially challenges the chancery court's December 13, 2022 order, not the contempt judgment before us now. On December 13, 2022, Bobby was ordered not to speak publicly or communicate the facts of the case through print or broadcast media. The order also required that "no further mailouts containing information about the Ward, her family members, or her affairs may be procured or produced by or on behalf of Dr. Bennett." Although Bobby raised the potential free speech violation at that time, he did not designate the transcript of the December 13, 2022 hearing to enable us to evaluate his First Amendment claim now. In *Abercrombie v. Abercrombie*, 282 So. 3d 763 (Miss. Ct. App. 2019), we stated that it was the duty of the appellant to designate the necessary transcripts, pleadings, and information for inclusion in the record on appeal. *Id.* at 772 (¶32) (citing *Pennington v. Dillard Supply Inc.*, 858 So. 2d 902, 903-04 (¶¶4-7) (Miss. Ct. App. 2003)). There we held that "[b]ecause [the appellant] Faith failed to provide an adequate record to review this issue, we are unable to consider it and cannot reverse the chancery court on this point." *Id.* Thus, the issue of any violation of Bobby's First Amendment rights is further procedurally barred because he did not designate an adequate record of us to consider it.

¶58. Notwithstanding the procedural bars, we note that in *In re R.J.M.B.*, 133 So. 3d 335, 345 (¶34) (Miss. 2013), the Mississippi Supreme Court set out the criteria for restraining free speech:

> For a restraint on such speech to prevail, the State must present a need to further "a state interest of the highest order." To overcome the presumption of invalidity, the trial court must determine: "(1) whether publication would result in damage to a 'near sacred right,' (2) whether the prior restraint would be effective and (3) whether less extreme measures were available.

*Id*. (citing *Jeffries v. State*, 724 So. 2d 897, 899 (Miss. 1998)). The United States Supreme Court has held that "[t]he protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358-59 (2003). Thus, for example, a State may punish those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id*. Mississippi has criminalized the mental abuse of vulnerable adults:

> Any person who willfully inflicts severe mental anguish upon a vulnerable person shall be guilty of a felony and shall be sentenced to not less than one (1) year nor more than five (5) years in the custody of the Department of Corrections and shall be fined not less than Two Thousand Dollars ($2,000.00) nor more than Five Thousand Dollars ($5,000.00).

Miss. Code Ann. § 43-47-19(4) (Rev. 2023). The Mississippi Supreme Court has stated that "the Mississippi Vulnerable Adults Act's goal was to protect citizens who cannot protect themselves from abuse." *Brandi's Hope Cmty. Servs. LLC v. Walters*, 391 So. 3d 162, 168 (¶23) (Miss. 2024).

¶59. In this case, the chancery court had found that Bobby's publication of the mailings and

the videos attached met these criteria for limiting his right to do so in the future. The court found that Patsy's "near sacred right" not to be subjected to conduct that would upset her and cause her mental anguish as well as her right as a litigant to have her case decided on the facts and law as presented in court would be violated if Bobby were allowed to "broadcast her personal affairs" through such mailings.

¶60. The chancery court further found that restraining Bobby from such mass mailing would be somewhat effective. Although the court said it could not undo the harm done by the mailings in the past, the court felt it could limit Bobby from harming Patsy in the future. The chancery court further found that less extreme measures were not available and that, if they were, they would not be effective. Bobby had been previously warned by the court of such behavior, but instead of complying, Bobby had actually escalated his course of conduct. Bobby presented no proof to contradict these findings by the chancery court and did not appeal these findings.

¶61. In summary, we find sufficient evidence to support the chancery court's finding Bobby in criminal contempt for the distribution of mass mailings and videos, which infringed upon his mother's sacred right to privacy and did not impermissibly restrain Bobby's free speech.

### IV. Whether Jody's Motion for Appellate Attorney's Fees should be granted or denied.

¶62. On March 25, 2025, Jody filed a motion for appellate attorney's fees. Bobby did not respond or raise any objection to the motion. In his motion, Jody notes that after the appellate record was submitted to this court, the chancery court awarded Jody attorney's fees

34

based on its finding Bobby in contempt of its orders. We take judicial notice of that order. *See Teal v. Jones*, 222 So. 3d 1052, 1058 (¶21) (Miss. Ct. App. 2017). On appeal, in an appropriately filed, separate motion, supported by an affidavit and time records of attorney Keith Kantack, Jody requests an award of $21,845.00 in appellate attorney's fees and $270.14 in expenses, or a total of $22,115.14, for having to respond in the appeal. Because we have affirmed the chancery court's finding of contempt, we find that Jody is entitled to recover the attorney's fees he was charged for the appellate work performed by Kantack. *See Riley v. Riley*, 196 So. 3d 1159, 1164-66 (¶¶23-32) (Miss. Ct. App. 2016) (holding that an award of appellate attorney's fees is appropriate when the chancellor awarded fees based on a finding of contempt and the recipient must defend the finding on appeal).

¶63. However, per *Cascio v. Cascio Investments LLC*, 327 So. 3d 59, 79 (¶61) (Miss. 2021), "only fees and expenses incurred in defense of the appeal may be awarded." Fees associated with "preappeal litigation" and the preparation of a motion for appellate attorney's fees "are ineligible for the purposes of this award." *Id*. "[H]ybrid entries are also not awarded." *Id*. After reviewing the time records submitted, and determining several hybrid entries and hours not related to the defense of the appeal, we find that the total of attorney time should be reduced by 12.05 hours and that the total amount of attorney's fees and expenses claimed should be reduced by $3,058.75. Therefore, we grant Jody's motion and award $19,056.39 in appellate attorney's fees and expenses.

## Conclusion

¶64. We find no error in the chancery court's denial of Bobby's motion for a continuance

35

because he was given ample and substantive notice of the proceedings and was adequately represented by counsel at the hearing. We further find no error in the chancery court's finding Bobby guilty of criminal contempt for violation of the court's orders concerning visitation and distribution of mass mailings. Bobby's First Amendment arguments are procedurally barred for two reasons: because he did not raise the claim during his contempt hearing and because he failed to designate an adequate record of the December 2022 proceedings for us to evaluate it. Notwithstanding that bar, we find that Bobby's violation of the mass-mailing order did not impermissibly restrain Bobby's speech. Finally, we grant Jody's motion for appellate attorney's fees and award him $19,056.39 in attorney's fees and expenses.

¶65. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., NOT PARTICIPATING.**